688 So.2d 1148 (1996)
Lettie Doris MERTENS, Plaintiff-Appellant/Appellee,
v.
Daniel F. MERTENS, Defendant-Appellant/Appellee.
No. 96-391.
Court of Appeal of Louisiana, Third Circuit.
October 9, 1996.
Writ Denied January 6, 1997.
*1149 Charles Gregory Gravel, Alexandria, for Lettie Doris Mertens.
Chris J. Roy, Jr., W. Jay Luneau, Alexandria, for Daniel F. Mertens.
Before THIBODEAUX, COOKS and AMY, JJ.
AMY, Judge.
This appeal arises from a community partition suit between Doris Mertens and Daniel Mertens. Both parties appeal from the trial court's judgment. For the reasons which follow, we affirm in part, reverse in part, and render.

DISCUSSION OF THE RECORD
Lettie Doris Mertens [Doris] and Daniel F. Mertens [Daniel] were married on January 1, 1985 in Rapides Parish, Louisiana. At the time of their marriage, Doris and Daniel entered into a community of acquets and gains. However, on December 17, 1992, Doris filed a petition for divorce pursuant to La.Civ.Code art. 102. Also, on that same day, Daniel filed a petition for divorce. On January 27, 1993, the trial court consolidated these two cases. The trial court subsequently signed a judgment of divorce.
However, Doris and Daniel were unable to agree upon a specific partition of the community property. Therefore, on May 28, 1993, Daniel filed a petition for partition of the community property. A trial on the merits of the partition was held on September 15, 1995. Doris and Daniel stipulated that there were four issues regarding the community partition suit: (1) whether Daniel had made an inter vivos donation of certain separate property, which consisted of $85,000.00 that he received as a settlement of a personal injury suit during their marriage, of approximately $50,000.00 to Doris; (2) whether Daniel was entitled to reimbursement under La. Civ.Code art. 2367 for separate property, a 1978 motor home, that he traded in to purchase community property, a 1975 motor home; (3) whether Daniel was entitled to reimbursement pursuant to La.Civ.Code art. 2367 for separate property, his money, used to purchase community immovable property; and (4) whether Doris was entitled to reimbursement under Article 2367 for paying a community obligation, a 1987 United States tax debt, with her alleged separate property.
The trial court rendered judgment on December 20, 1995. In its reasons for judgment, the trial court stated in part:
(1) All of the proceeds from the settlement of a lawsuit in which Mr. Mertens was injured are his separate property. There was insufficient proof to hold that Mr. Mertens intended to make a manual gift of any funds to his wife.
(2) The funds used in the purchase of the Bethel Street Property [community property] were in part from separate funds of Mrs. Mertens and other commingled funds. Mr. Mertens is not entitled to any reimbursement. He did not show that any of his separate funds were used to purchase this property.
(3) Mr. Mertens is not entitled to a claim for the value of his motor home. Compton v. Compton, 377 [371] So.2d 313 (La.App. 2nd Cir.) [sic] There was no evidence of the market value of the motor home.

*1150 (4) Mrs. Mertens is entitled to reimbursement of one-half of the funds used by her for a payment made to the Internal Revenue Service.
Each of the parties are cast for one-half of the court costs.
Doris appeals from that judgment and asserts that the trial court erred in finding that there was insufficient proof to hold that Daniel intended to make a manual gift of certain funds from his settlement of his personal injury case. Daniel also appeals from that judgment and asserts that the trial court erred in finding that (1) he was not entitled to reimbursement for his separate property used to purchase a community motor home; and (2) Doris was entitled to reimbursement for the payment of a community tax obligation. We will first discuss Doris' assignment of error.

LAW
MANUAL GIFT
"The manual gift, that is, the giving of corporeal movable effects, accompanied by a real delivery, is not subject to any formality." La.Civ.Code art. 1539. Money is a corporeal movable that may be donated by manual gift. Terrell v. Terrell, 26, 863 (La. App. 2 Cir. 5/10/95), 655 So.2d 600; Succession of Walker, 533 So.2d 70 (La.App. 3 Cir.1988), writ denied, 536 So.2d 1254 (La. 1989). "A donation inter vivos (between living persons) is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it." La.Civ.Code art. 1468 [asterisk omitted]. "For purposes of donations inter vivos, delivery is defined as relinquishing control or dominion over property and placing it within the dominion of the donee, irrevocably." Dastugue v. Fernan, 95-394 (La.App. 5 Cir. 10/18/95), 662 So.2d 538, 541, citing Brown v. Brown, 93-1105 (La.App. 3 Cir. 3/6/94), 635 So.2d 255, writ denied, 94-1667 (La.10/28/94), 644 So.2d 649; Succession of Serio, 597 So.2d 91 (La.App. 4 Cir.1992), writ denied, 600 So.2d 677 (La.1992). To establish a donation inter vivos of a manual gift, the donee has the burden of proving by strong and convincing evidence donative intent of the donor. Montet v. Lyles, 93-1724 (La.App. 1 Cir. 6/24/94), 638 So.2d 727, writ denied, 94-1985 (La.11/18/94), 646 So.2d 377; Brown, 635 So.2d 255; Fogg v. Fogg, 571 So.2d 838 (La.App. 3 Cir.1990), writ denied, 575 So.2d 372 (La.1991). In order to have a valid inter vivos donation, "[i]t is sufficient `that the will of the donor to give and the actual possession of the movable property by the donee operate simultaneously'." Succession of Miller, 405 So.2d 812, 819 (La.1981). Donative intent is a factual issue and is subject to the manifest error/clearly wrong standard of appellate review. Dastugue, 662 So.2d 538; Terrell, 655 So.2d 600.
The following evidence was presented at trial on this issue.
Doris testified that Daniel received an $85,000.00 settlement from a personal injury case during their marriage.[1] Doris stated that she had a loss of consortium claim in that particular suit, however, she noted that she dismissed her claim prior to the settlement. Doris testified that Daniel informed his attorney to make the settlement check out to both him and Doris. Doris further testified that, on November 19, 1992, they both went to Alexandria Telephone Credit Union [Credit Union] to deposit Daniel's settlement proceeds. She stated that they opened three checking accounts on that day, one in Doris' name, one in Daniel's name, and a joint account. The record reveals that $21,350.00 was deposited into Doris' account on that day. Doris acknowledged that the reason they opened three accounts was because the Credit Union did not allow more than $25,000.00 to be placed into one account per year.
Doris testified that, on December 2, 1992, they both went back to the Credit Union and that Daniel requested an employee of the Credit Union to transfer another $28,735.04 of the settlement proceeds from his account *1151 to a new account in Doris' name. Doris stated that they separated the next day and that she filed for divorce on December 17, 1992. She also stated that Daniel wanted his money back after the separation. Doris indicated that she and Daniel were "getting along great" prior to their separation. Doris said that she left Daniel because he pulled a gun on her son. When asked why Daniel gave her approximately $50,000.00 of his settlement proceeds, the following colloquy took place:
Q. Ms. Mertens, it's your testimony that Mr. Mertens gave you Fifty Thousand Dollars of the proceeds of the settlement, is that correct?
A. That's right.
Q. And the settlement was around Eighty-five Thousand?
A. That's right.
Q. Why did he give you that money? Did he tell you?
A. The day that I left he asked me how did I want to settlehow did I want to divide the property, and I told him right down the middle, half. He gave me part of the stock and he insisted on going to the credit union and doing  making the changes in the money and give me the money.
Q. Okay. So it's your understanding that he was giving you this fifty thousand in settlement of the community, is that what you're saying?
A. I don't know. I mean I  when we went to the credit union he went in there and told the lady what to do.
Q. Okay. What I'm asking is why did he indicate to you that he gave you this Fifty Thousand Dollars?
* * * * * *
A. Well when I left he told me that I deserved more than that.
Daniel testified that he received $85,000.00 from a settlement of a personal injury case during his marriage to Doris. However, he denied that he requested his attorney to put his and Doris' name on the settlement check. Daniel stated that Doris handled all the financial affairs during their marriage. Daniel testified that, in November 1992, he deposited the $85,000.00 in three different accounts at the Credit Union because the Credit Union only allowed a customer to place a maximum of $25,000.00 per year in a particular account. He also noted that he put the money into those accounts so that he could draw interest. Daniel insisted that he did not inform Doris that he was giving her that money placed in her account in November 1992 nor did he intend to give her that money at that time.
When asked what happened on December 2, 1992, the following exchange took place:
Q. The records indicate that on December 2nd, 1992 there was a transfer from one account to another in the amount of Twenty-eight Thousand, Seven Hundred and Thirty-five Dollars. You heard Ms. Mertens testify that that also was a gift that you gave her, or that you gave her for settlement purposes or what have you. Is that accurate?
A. No, sir.
Q. If you will, tell the Court on that day how thatdid you go to the credit union, first of all, on that day?
A. Yes.
Q. Did you instruct anyone to open up a new account?
A. Only for me.
Q. Okay. What was the purpose in opening up a new account for you?
A. She was leaving and I wanted to try to get my money back, and she would not give me the savings account money. She said she would not give it to me. So I went down there and told them to get my joint checking account, which it was my money to start with from the law suit injury thing, and I told them to put it in my new, separate checking account.
Q. Did you instruct anyone to open up an account in Ms. Mertens' name and put this Twenty-eight Thousand dollars in it?
A. No, sir.

*1152 Q. Did you ever intend to give her this Twenty-eight Thousand Dollars as any kind of gift?
A. No, sir.
Q. Did you ever state that to her?
A. No, sir.
Q. Did you ever state that to anyone?
A. No, sir.
Daniel testified that he never intended to give Doris a gift of about $50,000.00 from his settlement proceeds. Finally, Daniel stated that he and Doris were not getting along well at the time they separated and that their family life was "never a good situation."
Joyce Banks Knapp testified through deposition that she was employed at the Credit Union. She testified that, on December 2, 1992, Daniel instructed her to open an account in Doris' name and transfer approximately $28,000.00 from his account to her new account. She noted that Daniel signed the transfer ticket to complete the transaction. She acknowledged that she did not remember the November 1992 transactions. Finally, she admitted that some of her testimony regarding the December 1992 transaction was reconstructed from memory by going back and looking at documents and having conversations with Doris.
The trial court was faced with conflicting testimony as to whether Daniel intended to give Doris approximately $50,000.00 from his settlement proceeds as a donation inter vivos. The trial court chose to believe Daniel. In Stobart v. State Through DOTD, 617 So.2d 880, 882-883 (La.1993), the Louisiana Supreme Court thoroughly explained the appellate standard of review:
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel that its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
This court has recognized that "[t]he reason for this well-settled principle of review *1153 is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

As previously stated, Doris had the burden of proving that Daniel gave her the money as a manual gift by strong and convincing evidence. After a review of the record, we cannot conclude that Daniel's story was so internally inconsistent or implausible. While we may have weighed the evidence differently had we been the initial trier of fact, we cannot conclude that the trial court's evaluations of credibility and inferences of fact were unreasonable. Therefore, we conclude that the trial court was not manifestly erroneous in finding that Doris failed to produce sufficient evidence that Daniel intended to make a manual gift of any of his settlement funds. Accordingly, we find that this assignment of error is without merit. Next, we will discuss Daniel's assignments of error.

REIMBURSEMENT FOR THE MOTOR HOME TRADE IN
Daniel argues that the trial court erred in finding that he was not entitled to reimbursement for use of his separate property to acquire movable community property. We agree.
Daniel testified that he owned a 1978 Broughm Motor Home prior to his marriage to Doris. Doris acknowledged that she knew this motor home was Daniel's separate property. Daniel testified that he traded his 1978 Broughm Motor Home to purchase a 1975 Tioga Motor Home during his marriage to Doris. Daniel unequivocally testified that he received $9,000.00 for his trade in of his 1978 Broughm Motor Home and that the purchase price for the 1975 Tioga Motor Home was $11,000.00. To corroborate his testimony, Daniel introduced into evidence a receipt from Cenla Camping Center, Inc. which clearly reveals that Daniel received a $9,000.00 trade-in for his 1978 Motor Home. Therefore, after taxes and title expenses, Daniel only had to pay $2,145.00 for the 1975 Tioga Motor Home.
However, the trial court denied Daniel's claim for reimbursement finding that "[t]here was no evidence of the market value of the [1978] motor home." The trial court cited Compton v. Compton, 371 So.2d 313 (La.App. 2 Cir.), writ denied, 374 So.2d 657 (La.1979), in support of its conclusion. In Compton, the husband brought a claim for reimbursement, alleging that he had traded in an automobile that he owned prior to marriage to acquire another automobile during his marriage. The trial court denied the husband's claim for reimbursement. The second circuit, in affirming the trial court, stated: "No evidence was offered to show the actual market value of the Ford Comet which was traded on a 1972 Ford Torino. The trial judge rejected this claim because he found the `trade-in allowance' not to be reliable evidence of true market value." Id. at 316.
But, Compton was decided before the 1979 revisions to the Matrimonial Regimes section of the Civil Code. After the 1979 revisions, Article 2367 stated in part that:
If separate property of a spouse has been used for the acquisition, use, improvement, or benefit of community property, that spouse upon termination of the community is entitled to one-half of the amount or value that the property had at the time it was used if there are community assets from which reimbursement may be made.
Professors Katherine Shaw Spaht and W. Lee Hargrave, in Louisiana Civil Law Treatise, Matrimonial Regimes, Volume 16 (1989), Supplement 1996, § 7.15, pages 127-128, discuss the changes in the burden of proof for reimbursement claims:
A series of cases decided in the period from 1988-1990, with a few exceptions, appear to impose a more difficult burden of proof on the spouse seeking to recover for the use of separate property to benefit community property. In Kaplan v. Kaplan, 522 So.2d 1344 (La.App. 2d Cir.1988), *1154 the husband alleged that he expended approximately $10,000.00 of his separate property to benefit the community, but he offered no proof in the form of documentation to support his allegations. Therefore, the court opined that in order to recover reimbursement, "a spouse must show that the funds were actually used to benefit the community." Id. at 1347. Two subsequent cases reaffirmed the holding in the Kaplan case and imposed additional burdenscompelling proof that funds used for the benefit of the community and that a "strong and substantial economic advantage incurred to the community...."
The principal cases cited as authority for these additional burdens imposed on the reimbursement claimant were decided under the law applicable before 1980. Even under pre-1980 reimbursement legislation at least one judge was concerned about the impossible burden imposed on the claimant alleging the use of his separate property to improve community property. Because the introductory clauses in Articles 2366 and 2367 are identical, the claimant alleging the use of separate property to benefit community property should bear no greater burden than the claimant alleging the use of community property to benefit separate property. The strong public policy favoring the community and disfavoring separate property claims in the context of reimbursement appears to have been rejected by the Legislature in the enactment of Articles 2366 and 2367. Hence, the policy justification for imposing a more onerous burden on the claimant alleging the use of separate property no longer exists. [Footnotes omitted and emphasis in original omitted.]
We conclude the trial court erred by refusing Daniel reimbursement, under Article 2367, for his separate property, the 1978 Motor Home, used to acquire community property, the 1975 Motor Home. Further, the evidence is undisputed that the value of the 1978 Motor Home was $9,000.00 at the time it was used as a trade-in for the community Motor Home. Accordingly, Daniel is entitled to reimbursement of one-half of $9,000.00, which is $4,500.00, under Article 2367 for the use of his separate property to acquire community property.

THE 1987 TAX DEBT
Daniel argues that the trial court erred in finding that Doris is entitled to one-half of the funds used by her for a payment to the Internal Revenue Service. We disagree.
Doris testified that she and Daniel had a 1987 United States tax obligation of $4,958.00. Doris further testified that in April 1988 she withdrew a sum of money from her separate bank account and deposited that money into their joint banking account to pay the Internal Revenue Service. The records from Doris' bank account and Doris' and Daniel's joint banking account reveal this transaction. Doris testified that she then issued a check from the joint checking account in the amount of $4,958.00 to the Internal Revenue Service in April 1988.
Daniel does not dispute that Doris deposited her separate funds into their joint banking account to make their tax payment. However, Daniel insists that Doris' separate funds became "co-mingled" with the community funds, and, therefore, became community property. "[W]hen separate funds are commingled with community funds to the extent that separate funds are no longer capable of identification, and it is impossible to trace the origin of the funds, then all funds are considered community" property. Cutting v. Cutting, 625 So.2d 1112, 1115 (La. App. 3 Cir.1993), writ denied, 93-2770 (La.1/7/94), 631 So.2d 453. But, funds are not rendered community funds by virtue of the fact that they are put into a joint account. Jensen v. Jensen, 93-455 (La.App. 3 Cir. 1/5/94), 630 So.2d 959.
We conclude that the trial court was not clearly wrong in finding that Doris was entitled to reimbursement under Article 2367 for paying the community 1987 tax obligation with her separate funds. We find that Doris' separate funds were not commingled with the community funds in the joint checking account so that their origin was untraceable. The record substantiates that Doris deposited her separate funds into the joint checking account and then wrote a check from that *1155 joint checking account to the Internal Revenue Service. The record also reveals that Doris deposited an amount of her separate funds to pay this community tax obligation. Further, these transactions occurred in a very short period of time. Accordingly, we find that this assignment of error is without merit.

DECREE
For the foregoing reasons, we reverse the trial court's judgment that Daniel is not entitled to reimbursement under La.Civ.Code art. 2367 for the use of his separate property to acquire community property. IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Daniel Mertens is entitled to reimbursement from Doris Mertens in the amount of FOUR THOUSAND FIVE HUNDRED AND 00/100 ($4,500.00) DOLLARS pursuant to La.Civ.Code art. 2367. In all other aspects, the judgment of the trial court is affirmed. Costs of this appeal are assessed equally between Doris Mertens and Daniel Mertens.
REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.
NOTES
[1] "Damages due to personal injuries sustained during the existence of the community by a spouse are separate property." La.Civ.Code art. 2344. Doris does not dispute that the $85,000.00 from the settlement was originally Daniel's separate property. Doris argues that Daniel gave her about $50,000.00 from that settlement as a gift.