STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**05-1584**


**ALICE MONCRIEF**

**VERSUS**

**SUCCESSION OF LESLIE THOMAS ARMSTRONG**


************

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT,
PARISH OF SABINE, NO. 57,099,
HONORABLE CHARLES B. ADAMS, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Chief Judge Ulysses Gene Thibodeaux and Judges Jimmie C. Peters and J. David Painter.


**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

**David A. Rothell**
**Attorney at Law**
**400 Travis Street**
**Suite 1500**
**Shreveport, LA  71101**
**(318) 425-5252**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Alice Moncrief**

**Robert E. Plummer**
**Attorney at Law**
**Post Office Box 839**
**Mansfield, LA  71052**
**(318) 872-3945**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Succession of Leslie Thomas Armstrong**

PETERS, J.

The plaintiff, Alice Moncrief, brought suit against the Succession of Leslie Thomas Armstrong (Succession), seeking compensation for services rendered to Mr. Armstrong before his death. The Succession answered her demands and reconvened against her, seeking to recover certain sums it claims Ms. Moncrief improperly took from Mr. Armstrong and/or his estate. After trial, the trial court rejected both the principal demand and the reconventional demand, and both Ms. Moncrief and the Succession have appealed. For the following reasons, we affirm the trial court's judgment rejecting Ms. Moncrief's demand, reverse the trial court's judgment rejecting the Succession's reconventional demand, and render judgment in favor of the Succession and against Ms. Moncrief in the amount of $79,000.00.

## DISCUSSION OF THE RECORD

Most of the underlying facts giving rise to this litigation are undisputed. In April of 1998, Leslie Thomas Armstrong and his wife of forty years, Betty Armstrong, divorced. Prior to their divorce, the couple had amassed a comfortable estate, which they amicably divided. As a result of the property division, Mr. Armstrong acquired, among other assets, immovable property situated in Gatesville, Texas, and 250 shares of stock in A.L.M. Corporation, an Alaska pipeline company.[1]

In June of 1998, Mr. Armstrong and Ms. Moncrief began living together in Mr. Armstrong's Texas home. At that time, Mr. Armstrong had retired from a career in pipeline construction work, mainly in Alaska, and Ms. Moncrief was employed as a nurse's aid. She remained employed for approximately one year after the couple began living together.

---

[1]Throughout the record, the parties refer to the "Alaska property" owned by Mr. Armstrong. However, it is clear from the record that Mr. Armstrong owned no property in Alaska—he merely owned stock in an Alaska Corporation.

In September of 1998, Mr. Armstrong sold his Texas property and purchased a home on Toledo Bend Lake in Louisiana (sometimes hereinafter referred to as "the lake property"), which had previously been owned by Ms. Moncrief's father. The couple resided together on the lake property until Mr. Armstrong's death on September 5, 2003. During the five years the couple resided on Toledo Bend Lake, they traveled, fished on the lake, visited friends in both Louisiana and Texas, and generally enjoyed life together. These activities occurred despite the fact that, within one year after the couple began living together, Mr. Armstrong developed significant health problems. Initially, Mr. Armstrong's health problems related to his heart and resulted in two surgeries—one in 2000 and another in 2001. However, soon after developing heart difficulties, Mr. Armstrong was also diagnosed as suffering from cancer. He underwent surgery in 2001 for the removal of a malignant tumor in his lung and again in May of 2003 to remove a malignant tumor in his stomach. He lost his battle with cancer on September 5, 2003.

Despite his numerous hospitalizations and subsequent recovery periods, Mr. Armstrong maintained an active lifestyle, doing so even after being advised in the summer of 2003 that his cancer was terminal. In fact, in early August of 2003, Mr. Armstrong and Ms. Moncrief traveled to Alaska. However, while there, Mr. Armstrong became seriously ill and was transported on August 29, 2003, by air ambulance to the Christus Schumpert Hospital in Shreveport, Louisiana. Six days later he died in that hospital.

After Mr. Armstrong's last will and testament was submitted for probate, Ms. Moncrief brought suit against the Succession,[2] asserting that Mr. Armstrong had

---

[2]Ms. Moncrief first filed a claim in the succession proceedings as a creditor. Thereafter, she filed a separate claim against the succession, and the trial court consolidated these two actions.

promised to compensate her for services rendered to him during the years they lived together. The Succession responded to the suit by filing an answer denying Ms. Moncrief's assertions and by filing a reconventional demand asserting that Ms. Moncrief improperly obtained certain funds belonging to the estate. The two-day trial on the merits began June 30, 2005. After completion of the evidence, the trial court took the issues under advisement and, on September 1, 2005, filed written reasons for judgment rejecting both the principal and reconventional demands. The trial court executed a judgment to that effect on September 6, 2005, and these appeals followed.

## OPINION

### *Ms. Moncrief's Appeal*

Mr. Armstrong executed his last will and testament on October 2, 1998, or some four months after he and Ms. Moncrief began living together. He did not mention Ms. Moncrief in that will. Instead, he named certain collateral relatives as his sole heirs in the event of his death. Nevertheless, Ms. Moncrief claims that Mr. Armstrong promised to compensate her for the services she rendered to him during the time they lived together by leaving her all of his Louisiana and Alaska property at his death. By her suit, she seeks to enforce that claim. She bases her right to enforcement of the alleged promise on the decision in *Succession of Joublanc*, 199 La. 250, 5 So.2d 762, 764 (1941), wherein the supreme court stated:

> One who renders valuable services to another on his promise that in his will he will compensate to the extent of the value of the services the party rendering them is entitled to collect their value from the succession of the party for whom the services were rendered if he dies without having fulfilled his promise.

There is no dispute but that Ms. Moncrief rendered valuable services to Mr. Armstrong during the time they lived together. She basically performed all the duties

3

of a spouse, and, when Mr. Armstrong's health difficulties incapacitated him, she looked after his personal needs. Thus, the first question to be answered is whether the services rendered by Ms. Moncrief were in exchange for a promise that she would receive the Louisiana and Alaska property at Mr. Armstrong's death. In an effort to satisfy her burden of proof on this question, Ms. Moncrief testified and called seven[3] other witnesses (Jane Thornton, Sherry Laverne Wilson, Steve Moncrief, Fannie Faye Ortis, Sandra K. Cain, Laurie Rink, and Harry Dewayne Wilson) who testified concerning the extent of Mr. Armstrong's promises.[4]

Jane Thornton testified that she moved to Toledo Bend Lake in 2002, but had known Mr. Armstrong since 1993. She visited Mr. Armstrong and Ms. Moncrief at their Toledo Bend Lake home often and observed Ms. Moncrief's activities in cooking, keeping house, and caring for Mr. Armstrong's personal needs. According to Ms. Thornton, as early as 1999, Mr. Armstrong confided in her that he intended to leave Ms. Moncrief the lake property and that he intended to set up a bank account in Texas for her. With regard to the A.L.M. Corporation stock, Ms. Thornton testified that, in a conversation which occurred just before the couple left for Alaska in August of 2003, Mr. Armstrong told her that he wanted to leave that stock to Ms. Moncrief because her son lived in Alaska and because "he owed it to her."

Sherry Laverne Wilson is a hair dresser who lived on Toledo Bend Lake adjacent to Mr. Armstrong and Ms. Moncrief from the time they moved to the lake

---

[3]Ms. Moncrief actually called an eighth witness, Pat Angely. The Succession's representative objected to Ms. Angely's testimony, and the trial court sustained the objection. Although her testimony was proffered at trial, Ms. Moncrief has not assigned as error the trial court's refusal to allow Ms. Angely to testify. Therefore, her testimony cannot be considered.

[4]Because she filed her claim within one year of Mr. Armstrong's death, Ms. Moncrief was able to avail herself of the parol evidence exception provided in La.R.S. 13:3721(1) and (4). Recognizing her right to introduce parol evidence, the trial court freely admitted parol evidence during the trial.

4

property until Mr. Armstrong's death. According to Ms. Wilson, on two or three occasions while she cut Mr. Armstrong's hair, she and he discussed the need for Ms. Moncrief to have financial security in the event of his death. The last occasion occurred, according to Ms. Wilson, a few days before the couple left for Alaska in August of 2003. Ms. Wilson testified that she broached the subject and told him: "I just hope to God that Alice is taken care of if something happens to you." According to Ms. Wilson, Mr. Armstrong responded by stating, "[W]ell not yet but I can assure you she will be when we get back [from Alaska]." According to Ms. Wilson, Mr. Armstrong expressed his intention to give Ms. Moncrief the lake property and the stock in the Alaska corporation.

Steve Moncrief lives in Alaska and is Ms. Moncrief's son. He testified that he traveled to Louisiana from Alaska the day before Mr. Armstrong's death and was en route to the hospital in Shreveport when he received a telephone call from Mr. Armstrong asking him to run some errands for him. Pursuant to Mr. Armstrong's instructions, he immediately went back to the lake house and retrieved Mr. Armstrong's October 1998 will. The next morning he was en route to Shreveport with the will when he received another telephone call informing him that Mr. Armstrong had died.

Fannie Faye Ortis testified that she had known Mr. Armstrong for approximately twenty years and had known Ms. Moncrief since 1965. She visited with them often when they lived on the lake property, despite the fact that most of that time she resided in Morgan City, Louisiana. Until his health began to fail, Mr. Armstrong never discussed his personal business with Ms. Ortis. However, she testified that, during a Labor Day 2001 visit, Mr. Armstrong confided in her that he

5

intended to provide for Ms. Moncrief. She credited her long-time, close friendship with Ms. Moncrief as the reason he felt the need to share this information with her. She testified that Mr. Armstrong repeated this comment to her in a telephone conversation which occurred shortly before the couple traveled to Alaska for the last time. According to Ms. Ortis, Mr. Armstrong assured her that, when he returned from Alaska, he intended to see to it that she received whatever property he owned in Louisiana and Alaska; the rest of his property, he intended to leave to his nieces and nephews.

Sandra K. Cain of Gatesville, Texas, works as a deputy voter registrar and deputy county clerk in the Coryell County Courthouse. She has known Mr. Armstrong since 1988 and has considered him a good friend since 1994. She testified that, shortly before the August 2003 Alaska trip, Mr. Armstrong telephoned her and asked that she contact his Texas attorney, William Hix, and inform Mr. Hix that he wanted to see Mr. Hix about changing his will. According to Ms. Cain, Mr. Armstrong told her that he wanted to leave Ms. Moncrief his Louisiana and Alaska property. Ms. Cain relayed this message to Mr. Hix, but Mr. Armstrong did not see Mr. Hix before traveling to Alaska. She further testified that, upon hearing that Mr. Armstrong was in the Shreveport hospital, she telephoned him and he again asked her to call Mr. Hix and ask him to come to Shreveport. She relayed this message to Mr. Hix, who informed her that he was not licensed to practice law in Louisiana and would not be able to assist Mr. Armstrong. She then relayed that message to Mr. Armstrong. The next time she telephoned the hospital, she was informed that Mr. Armstrong had died.

Laurie Rink is a licensed practical nurse who had known Ms. Moncrief for twenty years and Mr. Armstrong for seven or eight years. Ms. Rink recounted a May 2003 event where she, her fiancé, and Mr. Armstrong were fishing on Toledo Bend Lake and Mr. Armstrong brought up the subject of Ms. Moncrief's future security. Mr. Armstrong expressed his feelings for Ms. Moncrief and told them that he wanted to make sure she was well taken care of. Specifically, he stated that the lake property was to be Ms. Moncrief's. The conversation went no further than that statement, and Ms. Rink never again discussed the matter with Mr. Armstrong.

Harry Dewayne Wilson is Mr. Armstrong's step-grandson. He testified that he was visiting Mr. Armstrong one night at the lake property just before the Alaska trip and that Mr. Armstrong asked him what he thought he should do with his money. He testified that he informed Mr. Armstrong that the money should be used to "take care of Alice." According to Mr. Wilson, Mr. Armstrong told him that Ms. Moncrief "would be getting the lake house and that she would be taken care of."

Ms. Moncrief testified that, during Mr. Armstrong's several surgeries, she maintained the household and cared for his personal and physical needs and that ultimately she became responsible for all aspects of his day-to-day needs. However, the extended duties imposed upon her were not what she anticipated in the beginning of the relationship. She described herself as nothing more than a lover and companion in the beginning, without any promises from either party. However, according to Ms. Moncrief, in 1998, or before the medical problems developed to any significant degree, she and Mr. Armstrong began discussing her future. He even proposed marriage, a proposal which she refused. It was not until 1999 that Mr. Armstrong first made her any kind of promise with regard to her future financial

7

stability. She asserted that, at that time, he promised her the lake house and the contents of a bank account to be established in the future.

Ms. Moncrief candidly admitted that, after Mr. Armstrong's medical difficulties truly manifested themselves, in her mind her relationship with Mr. Armstrong continued based on two factors—her continued feelings for Mr. Armstrong *and* his willingness to compensate her materially. Described another way, no matter how strongly Ms. Moncrief felt about Mr. Armstrong, she had no intention of remaining in the relationship unless he paid her something. She described this new relationship as having aspects of both romance and business.

"A party who demands performance of an obligation must prove the existence of the obligation." La.Civ.Code art. 1831. As previously noted, Ms. Moncrief had the advantage of being able to use parole evidence as allowed by La.R.S. 13:3721. Concerning her burden of proof under that statute, La.R.S. 13:3722 provides: "When parol evidence is admissible under the provisions of R.S. 13:3721 the debt or liability of the deceased must be proved by the testimony of at least one creditable witness other than the claimant, and other corroborating circumstances."[5] In considering the scope of that burden of proof, we further note that La.Civ.Code art. 1967 provides:

Cause is the reason why a party obligates himself.

---

[5]We note that the burden of proof when parol evidence is allowed under La.R.S. 13:3721 is more stringent than the general rule of proof of obligations contained in La.Civ.Code art. 1846, which requires that an oral contract with a "price or value [] in excess of five hundred dollars . . . must be proved by at least one witness and other corroborating circumstances" and which allows the plaintiff herself to serve as the witness to establish the existence of the oral contract, *Suire v. Lafayette City-Parish Consolidated Government*, 04-1459, 04-1460, 04-1466 (La. 4/12/05), 907 So.2d 37. Louisiana Revised Statutes 13:3722 requires the testimony of a least one creditable witness other than the plaintiff and other corroborating circumstances. The purpose of the requirement that there be a creditable witness other than the plaintiff is to eliminate the possibility of fraud and perjury by witnesses who have a direct pecuniary or proprietary interest in the claim. *Savoie v. Estate of Rogers*, 410 So.2d 683 (La.1981).

8

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. *Reliance on a gratuitous promise made without required formalities is not reasonable.*

(Emphasis added.)

Additionally, Comment (f) to this Article states in part that "a party should place no reliance on his belief that he has entered a gratuitous contract when some formality prescribed for the validity of such a contract has been omitted. Thus, reliance on a gratuitous donation not made in authentic form is not reasonable. See C.C. Arts. 1523 and 1536 (1870)."

The promises credited to Mr. Armstrong were not in authentic form. Thus, Ms. Moncrief cannot and does not assert a gratuitous contract. Instead, she asserts that Mr. Armstrong's promise was in exchange for her services. In considering the cause of the asserted contract as expressed by Ms. Moncrief's testimony, the trial court stated:

> [Ms. Moncrief] never articulated or specified the actual agreement. While she referenced the decedent's alleged assertions that he was going to give her certain property, or "take care of her," she never stated the quid pro quo or what she had promised him in return. While there can be little doubt that she actually cooked, cleaned, maintained their house, and cared for him, there was no indication that this was any more than the actions of a loved one. If they had been married her actions would have clearly met her obligations as a spouse. C. C. Art. 98. While they were not married, they lived together as a husband and wife, without the benefits and obligations of marriage. It is the belief of this Court that they cared deeply for each other and that their respective behavior was based upon those feelings and not based upon some contractual agreement.

9

In other words, the trial court considered any promise on the part of Mr. Armstrong to be gratuitous. That being the case, it was unenforceable because it was not in authentic form. *See* La.Civ.Code art. 1967.

The standard of appellate review of factual findings in a civil action is the manifest error/clearly wrong standard, and factual findings should not be reversed absent manifest error or unless they are clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the reviewing court may not reverse. *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106 (La.1990). Consequently, when there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous. *Id.*

Even assuming that Ms. Moncrief's testimony could be interpreted as representing mutual promises, she failed to establish those mutual promises with at least one credible witnesses other than herself. As pointed out by the trial court in its reasons for judgment, none of the witnesses called by Ms. Moncrief testified to an agreement between Mr. Armstrong and Ms. Moncrief.[6] At best, the testimony of these witnesses established an expressed intent on the part of Mr. Armstrong to take care of Ms. Moncrief by taking certain actions in the future. That is to say, the conversations reflected Mr. Armstrong's intent to change his will and reward Ms. Moncrief for her services, but did not evidence a contractual obligation to do so. Thus, we find no error in the trial court's determination that Ms. Moncrief failed in

---

[6]The trial court also expressed its concern over the credibility of some of the witnesses. However, the issue of the credibility of these witnesses is immaterial because, regardless of whether the testimony is believed or not, the testimony failed to establish mutual promises in any event.

her burden of proof to establish the existence of a contract between herself and Mr. Armstrong.

Ms. Moncrief asserts in the alternative that Mr. Armstrong gave her the stock in A.L.M Corporation prior to his death by manually delivering the stock certificate to her. Specifically, she asserts that, immediately before she and Mr. Armstrong left for Alaska, he gave her the stock certificate and expressed his intention to effect a transfer into her name while they were in Alaska. She acknowledges, however, that the transfer did not occur. According to Ms. Moncrief, when they arrived in Alaska, the corporate attorney was not available to make the official transfer during the first two weeks and thereafter Mr. Armstrong's health precluded any additional efforts.

Gratuitous donations of incorporeal things are valid only if executed before a notary and two witnesses. La.Civ.Code art. 1536. The donation of stock, an incorporeal movable, falls within that provision. *Blue v. Coastal Club, Inc.*, 524 So.2d 883 (La.App. 3 Cir.), *writ denied*, 525 So.2d 1044 (La.1988). However, the formalities of La.Civ.Code art. 1536 are not necessary if shares of stock are validly transferred pursuant to Louisiana stock-transfer legislation. *Primeaux v. Libersat*, 322 So.2d 147 (La.1975). Ms. Moncrief cites La.R.S. 10:8-307 and *Ackel v. Ackel*, 595 So.2d 739 (La.App. 5 Cir. 1992), to argue that a purchaser (a purchaser includes one who takes by gift pursuant to La.R.S. 10:1-201(32) and (33)) who receives a certificated security in registered form without a necessary endorsement is entitled to have the endorsement supplied and that, as between the transferor and transferee, the transfer is complete upon delivery. Hence, she argues that the transfer from Mr. Armstrong to herself was valid. However, Ms. Moncrief's argument overlooks the law that the transfer provisions of the Commercial Code supersede the Civil Code in

11

matters of form only. *See Fogg v. Fogg*, 571 So.2d 838 (La.App. 3 Cir. 1990), *writ denied*, 575 So.2d 372 (La.1991). "The underlying validity of the donation is a 'threshold' requirement controlled by substantive rules on donations contained in the Civil Code." *Id.* at 841. This means that the substantive requirements of a divestment and donative intent must be fulfilled in order to effect a valid donation. *Id.*

"To establish a donation inter vivos of a manual gift, the donee has the burden of proving by strong and convincing evidence donative intent of the donor." *Mertens v. Mertens*, 96-391, p. 3 (La.App. 3 Cir. 10/9/96), 688 So.2d 1148, 1150, *writ denied*, 96-2716 (La. 1/6/97), 685 So.2d 123. "A donation *inter vivos* (between living persons) is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it." La.Civ.Code art. 1468. For purposes of a donation inter vivos, delivery is defined as relinquishing control or dominion over property and placing it irrevocably within the dominion of the donee. *Mertens*, 688 So.2d 1148*; Brown v. Brown*, 93-1105, 93-1106, 93-1107 (La.App. 3 Cir. 4/6/94), 635 So.2d 255, *writ denied*, 94-1667 (La. 10/28/94), 644 So.2d 649; *Succession of Serio*, 597 So.2d 91 (La.App. 4 Cir.), *writ denied*, 600 So.2d 677 (La.1992).

In the present case, Mr. Armstrong never signed the stock certificate transferring it to Ms. Moncrief, and the face of the stock certificate itself had a general stock redemption restriction which prohibited its transfer without compliance with the terms of the restriction. The record contains no evidence of compliance with that restriction. The trial court concluded that the failure to comply with the stock redemption agreement precluded transfer by manual gift. Thus, the trial court

12

concluded that Mr. Armstrong still owned the stock at the time of his death. While we agree with the ultimate disposition of this issue by the trial court, we further note that Ms. Moncrief's testimony itself clearly disclosed that there never was an irrevocable divestiture of the stock by the deceased. Ms. Moncrief gave the following testimony:

> Q    So we don't have the original certificates here or a copy of the back, but it is your testimony that he did not sign the certificates?
>
> A    Correct.
>
> Q    And there was a place on the back to sign, correct?
>
> A    Correct.
>
> Q    Where he could put who it's been transferred to and sign and date?
>
> A    Correct.
>
> Q    Do you recall in the deposition that you gave discussing about going to Alaska and taking care of the Alaskan stock?
>
> A    Correct.
>
> Q    And taking care of it referred to getting it into your name, correct?
>
> A    We were gonna try to see the attorney over there in Alaska for the A.L.M. Corporation, Terry Dragger, he was unavailable.
>
> Q    And did you get it in your name during the two weeks that you were there before he got sick?
>
> A    No.

Thus, by the plaintiff's own admission, she did not meet the burden of proving by strong and convincing evidence that the deceased intended to make a manual gift to her of the stock.

For the foregoing reasons, we find no merit in Ms. Moncrief's appeal.

### *Succession's Appeal*

13

The Succession's claims in its reconventional demand arise from the fact that, after Mr. Armstrong's death, Ms. Moncrief cashed two checks drawn on his account totaling $75,000.00 and withdrew $4,000.00 from his account using his ATM card. The trial court rejected without comment the Succession's claims with regard to these funds. On appeal, the Succession asserts as error this aspect of the judgment of the trial court.

The only evidence concerning the facts surrounding these transactions came from Ms. Moncrief's testimony. According to Ms. Moncrief, Mr. Armstrong brought three personal checks with him to Alaska in August of 2003. At some point, he signed them in blank, and Ms. Moncrief acquired possession of the three checks. It is not disputed that she used one of the checks to pay Air Ambulance Specialists, Inc. $26,360.00 as its charges for transporting Mr. Armstrong from Alaska to Shreveport, Louisiana. According to Ms. Moncrief, some unknown person completed the other two checks, naming her as payee. One of the checks, drawn in the amount of $25,000.00 and dated August 3, 2003, cleared the drawee bank on September 8, 2003. The other check, drawn in the amount of $50,000.00 and dated July 31, 2003, cleared the drawee bank on September 15, 2003, essentially depleting the account. Ms. Moncrief acknowledged that between October 7, 2003, and December 4, 2003, she withdrew $4,000.00 from another account using Mr. Armstrong's ATM card. Thus, it is clear that Ms. Moncrief converted these funds after Mr. Armstrong's death. In fact, in her post-trial brief, Ms. Moncrief acknowledged receipt of the funds represented by the two checks and suggested that the trial court could reduce her principal demand by those amounts.

14

In its reasons for judgment, the trial court did not mention the reconventional demand, but characterized Ms. Moncrief's acquisition of these funds by saying that she had "helped herself to $75,000.00." While the trial court did not mention the ATM withdrawals, it is clear that Ms. Moncrief made those withdrawals as well. Thus, the Succession proved the conversion of $79,000.00.

Considering that the trial court did not mention the reconventional demand in its reasons for judgment, the only inference that can be drawn from the record is that the trial court believed Ms. Moncrief had a claim against the succession in *quantum meruit* but that she should not be allowed to recover any more than what she had already received over the course of five years and what she had helped herself to after Mr. Armstrong's death.[7] This inference is supported from the language of a summary judgment previously rendered in this matter wherein the trial court stated that Ms. Moncrief "has a claim against the succession" and from the trial court reasons for judgment wherein the trial court concluded that Ms. Moncrief "has been adequately compensated." Assuming this inference to be correct, we find that the trial court erred in this regard. Such a ruling would be inconsistent with the reasons given for rejecting the principal demand.

The trial court concluded that Ms. Moncrief failed to prove a valid claim against the Succession in her principal demand, and, as previously stated, we agree with that conclusion. Because the Succession owed her nothing, she was not justified in converting $79,000.00 to her personal benefit, and the Succession was entitled to judgment on its reconventional demand for the recovery of that amount.

---

[7]There was also evidence that, during their relationship, Mr. Armstrong had provided Ms. Moncrief with over $25,000.00 in cash, all living expenses, and a 1998 Lincoln automobile. Additionally, using Mr. Armstrong's credit card, Ms. Moncrief had purchased a John Deere riding lawn mower for $3,208.93 after his death.

15

## DISPOSITION

For the foregoing reasons we affirm the judgment of the trial court which rejected Alice Moncrief's claim against the Succession of Leslie Thomas Armstrong. We reverse the trial court's rejection of the reconventional demand and award judgment in favor of the Succession of Leslie Thomas Armstrong and against Alice Moncrief in the amount of $79,000.00. We tax all costs to Alice Moncrief.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**