STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

18-337

ACADIAN GAS PIPELINE SYSTEM

VERSUS

OLIVER LIECHT MCMICKENS, ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 257,060
HONORABLE PATRICIA E. KOCH, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Billy Howard Ezell, Phyllis M. Keaty, and Van H. Kyzar, Judges.

**AFFIRMED.**

John M. Wilson
Kelly Brechtel Becker
Katherine Seegers Roth
Jaclyn E. Hickman
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA 70139-5099
(504) 581-7979
COUNSEL FOR PLAINTIFF/APPELLANT:
    Acadian Gas Pipeline System

H. Brenner Sadler
Provosty, Sadler, deLaunay, APC
P. O. Drawer 13530
Alexandria, LA 71315-3530
(318) 445-3631
COUNSEL FOR DEFENDANTS/APPELLEES:
    Oliver Liecht McMickens
    Ricky Loren McMickens
    Mark R. McMickens
    Neal L. McMickens
    Scott A. McMickens

**KYZAR, Judge.**

In this expropriation litigation, the plaintiff, Acadian Gas Pipeline System, appeals from the trial court judgment in favor of the defendant landowners, denying its expropriation of a right-of-passage servitude through the landowners' property. For the following reasons, we affirm.

## DISCUSSION OF THE RECORD

On October 10, 2016, the plaintiff, Acadian Gas Pipeline System (Acadian), filed suit, seeking to acquire a perpetual servitude, in the form of a non-exclusive right-of-passage, across a 1,405-acre tract of land owned by the Defendants, Oliver Liecht McMickens, Ricky Loren McMickens, Mark R. McMickens, Neal L. McMickens, and Scott A. McMickens (referred to collectively as "the Defendants"). The property is located in Rapides Parish, just outside of Alexandria, Louisiana. The purpose of the servitude is to provide Acadian with access to and from its pipeline, which runs from east to west across the southernmost portion of the Defendants' property.

Following a March 16, 2017 bench trial, the trial court took the matter under advisement, then on August 31, 2017, it issued written reasons for ruling and signed a judgment denying Acadian's expropriation request. Notice of judgment was mailed to the parties on September 1, 2017. On September 12, 2017, Acadian filed a motion for new trial. The next day, the trial court wrote the word "Denied" diagonally across the proposed show-cause order and included the notation, "written reasons given," apparently to indicate that it had issued written reasons for its August 31, 2017 judgment. No hearing was held on the motion for new trial, and no written reasons regarding the motion appear in the appellate record. Subsequently, a hearing was held to address issues involving costs and attorney fees, and those issues were

disposed of in a judgment rendered on October 30, 2017. That same day, Acadian

filed a motion to appeal the trial court's August 31, 2017 judgment.

On January 31, 2018, this court issued a rule for Acadian to show cause why

its appeal should not be dismissed as being premature. Thereafter, we dismissed

Acadian's appeal, finding:

> [T]he notation "Denied" written on the rule to show cause order does
> not constitute a valid judgment. Since the trial court did not conduct a
> hearing or sign a judgment properly disposing of the motion for new
> trial, we find that the appeal order signed on October 30, 2017, was
> premature and that the trial court was not divested of its jurisdiction.
> Having concluded that we lack jurisdiction over this appeal, we find
> that the appeal must be dismissed and remanded to the trial court for
> consideration of Plaintiff's motion for new trial.

*Acadian Gas Pipeline System v. Oliver Liecht McMickens*, 17-1158, pp. 3-4
(La.App. 3 Cir. 1/31/18) (unpublished opinion).

On remand, Acadian moved for a judgment denying its motion for new trial,

after which the trial court rendered a judgment denying the motion on February 9,

2018. Thereafter, Acadian again filed a motion to appeal the trial court's August 31,

2017 judgment.

On appeal, Acadian raises three assignments of error committed by the trial

court:

1. The trial court erroneously denied expropriation by misallocating the burden of proof, forcing Acadian to prove its good faith and stripping it of the presumption of good faith that, until this decision, an expropriator has enjoyed under Louisiana law.

2. The trial court erroneously denied expropriation by applying the wrong legal standard for expropriation. It discarded the well-established *Red River* standard for the selection of the location and extent of the property to be expropriated, in favor of criteria that do not exist under Louisiana law.

3. The trial court's errors in denying expropriation resulted in an additional error: the failure to make any factual findings on the just compensation due to the Defendants for the expropriation of their property.

2

In response to this appeal, the Defendants filed a motion to strike and for a partial dismissal of Acadian's appeal, arguing that the issue of compensation due to the Defendants was not properly before this court since no judgment was rendered on that issue by the trial court. Acadian opposed this motion, and the matter was referred to the merits of the appeal.

## OPINION

"Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property." La.Const. art. 1, § 4(A). However, private property is subject to expropriation by a public entity when it is needed "for public purposes" and when just compensation is paid to the owner. La.Const. art. 1, § 4(B)(1). Private entities, when authorized by law, are also entitled to expropriate private property, such as in the case of Acadian, which was created for the purpose of building a pipeline to supply natural gas to the public. La.Const. art. 1 § 4(B)(4); La.R.S. 19:2(5). "[W]hether the purpose" of the expropriation is "public and necessary" is a determination made by the trial court, which finding will not be reversed absent manifest error. La.Const. art. 1, § 4(B)(5); *Lafayette City-Parish Consol. Gov't v. Person*, 12-307 (La. 10/16/12), 100 So.3d 293.

The law applicable to expropriation by a private entity was addressed by the supreme court in *Exxon Mobil Pipeline Co. v. Union Pacific Railroad Co.*, 09-1629, pp. 12-13 (La. 3/16/10), 35 So.3d 192, 200, wherein it stated:

> In challenges to the necessity of a taking, the landowner must prove that the legislatively-authorized expropriator exercised "its large discretion" arbitrarily, capriciously, or in bad faith. *Red River Waterway Com'n v. Fredericks*, 566 So.2d 79, 83 (La.1990). Whether the expropriator's purpose is public and necessary is a judicial determination that will not be reversed on appeal absent manifest error. *Calcasieu-Cameron Hosp. Serv. Dist. v. Fontenot*, 628 So.2d 75, 78 (La.App. 3d Cir.1993), *writ denied*, 94-0168 (La.3/18/94), 634 So.2d 854. In the context of expropriation, "necessary" refers to the necessity of the purpose for the expropriation not the necessity for a specific location. *Calcasieu-Cameron Hosp. Serv. Dist.*, 628 So.2d at 78. Once

3

public necessity is established, the extent and the location of property to be expropriated are within the sound discretion of the expropriation authority and determination of same will not be disturbed by the courts if made in good faith. *Id.*

The criteria to be considered by the expropriator in determining the location and extent of the property to be expropriated includes factors such as costs, environmental impact, long range area planning, and safety considerations. *Red River Waterway Com'n,* 566 So.2d at 83 (citing *U.S. v. Carmack,* 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946)). The amount of land and the nature of the acreage taken must be reasonably necessary for purpose of the expropriation, but it is not necessary "to show actual, immediate, and impending necessity for the expropriation." *City of New Orleans v. Moeglich,* 169 La. 1111, 126 So. 675, 677 (1930). The suitability of the property for expropriation is primarily a question of fact on which the judgment of the trial court will not be disturbed unless manifestly erroneous. *Board of Com'rs of New Orleans Exhibition Hall v. Missouri Pacific R. Co.,* 625 So.2d 1070, 1073 (La.App. 4th Cir.1993), *writ denied,* 93-3088, 93-3100 (La.1/28/94), 630 So.2d 802. By statute, expropriation of property for common carrier pipe line purposes may include "the real estate, rights of way, pipe in line, telephone and telegraph lines or other communication systems, tank facilities . . . *necessary for the proper conduct of its business as a common carrier, all fixtures, equipment and personal property of every kind owned, controlled, operated, used or managed, in connection with, or to facilitate the transportation, distribution and delivery of petroleum through lines constructed of pipe.*" La.Rev.Stat. 45:251(3) (emphasis supplied).

In *Calcasieu-Cameron Hospital Service District v. Fontenot,* 628 So.2d 75, 78-79 (La.App. 3 Cir. 1993), *writ denied,* 94-168 (La. 3/18/94), 634 So.2d 854, this court further explained:

> [T]he *extent and location* of the property to be expropriated are within the sound discretion of the body possessing the power of eminent domain, and these determinations will not be interfered with by the courts if made in good faith. *Greater Baton Rouge Port Comm'n. v. Watson,* [244 La. 136, 68 So.2d 901 (1953)]; *Board of Comm'rs. of Tensas Basin Levee Dist. v. Franklin,* 219 La. 859, 54 So.2d 125 (1951); *Evangeline Parish Police Jury v. Deville,* [247 So.2d 258 (La.App. 3d Cir.1971)]. Questions such as the location of the expropriation, the extent of the property taken, the nature of the title to be taken, and the wisdom of pursuing the particular improvement project relate to the necessity of the taking. The standard is whether the expropriator, in selecting the location and extent of the property to be expropriated, acted in bad faith or so capriciously or arbitrarily that its action was without an adequate determining principle or was unreasoned. Criteria to be considered by the expropriator include the availability of an alternate route, costs, environmental factors, long-

range area planning, and safety considerations. The expropriating agency may abuse its discretion by acting without considering and weighing the relevant factors, that is, by acting arbitrarily. *Red River Waterway Comm'n. v. Fredericks*, 566 So.2d 79 (La.1990), and authorities cited therein. However, the mere availability of a feasible alternative location is not, by itself, an indication that the expropriator has acted arbitrarily or capriciously in making its selection. *Faustina Pipe Line Co. v. Levert-St. John, Inc.*, 463 So.2d 964 at 969 (La.App. 3d Cir.), writ denied, 466 So.2d 1301 (La.1985), quoting *Louisiana Resources Co. v. Stream*, 351 So.2d 517 (La.App. 3d Cir.1977).

The standard of review applicable to civil matters was stated by this court in *Moncrief v. Succession of Armstrong*, 05-1584, p. 10 (La.App. 3 Cir. 9/27/06), 939 So.2d 714, 720, as follows:

> The standard of appellate review of factual findings in a civil action is the manifest error/clearly wrong standard, and factual findings should not be reversed absent manifest error or unless they are clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the reviewing court may not reverse. *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106 (La.1990). Consequently, when there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous. *Id.*

In this instance, the Defendants stipulated that the purpose for the sought-after servitude, access to the proposed route for maintenance of the pipeline, was public and necessary in nature. Thus, the only question before the trial court was whether Acadian, "in selecting the location and extent of the property to be expropriated, acted in bad faith or so capriciously or arbitrarily that its action was without an adequate determining principle or was unreasoned." *Red River Waterway Comm'n v. Fredericks*, 566 So.2d 79, 83 (La.1990) (citing *U.S. v. Carmack*, 329 U.S. 230, 67 S.Ct. 252 (1946)). In order to meet their burden of proving that Acadian acted arbitrarily, capriciously, or in bad faith in selecting the proposed route of the servitude, the Defendants were required to show that it "exercised its large discretion without consideration or adjustment with reference to principles, circumstances or significance." *Id.*

5

Maria Kerls, a senior land representative for an Acadian affiliate, testified that she handles all of the real-estate needs associated with the operation of the Acadian Haynesville Extension pipeline in her area. She explained that the pipeline transports natural gas south from the Haynesville Shale formation to Napoleonville, Louisiana, where it is purchased by third-party entities. She stated that the pipeline servitude is fifty feet wide and extends east from Highway 165, across property owned by Dr. Norm Thompson, and then south across the southernmost portion of the Defendants' property. As part of its July 7, 2010 pipeline servitude, Ms. Kerls testified that Acadian acquired the right to access the servitude for operation and maintenance of the pipeline. She thought that Acadian accessed the pipeline servitude from Highway 165 during construction, which required it to build temporary bridges over two water bodies, Willow Bayou and a drainage ditch separating the Defendants' property from that of Dr. Thompson. She stated that this required Acadian to obtain temporary permits from the United States Army Corps of Engineers in order to build the bridges. Once construction was completed, she said that it was required to restore the property to its former condition within six months.

Ms. Kerls testified that after construction, Acadian's operations group performed a close interval survey to identify areas where extra protection was required because the pipeline crossed other pipelines or was located in the vicinity of a water body. She said that protection was provided in this instance by cathodic protection test leads, which prevented erosion to the pipeline by way of electrical currents. Ms. Kerls testified that Acadian is required by federal regulation[1] to test

---

[1] 49 C.F.R. §192.645 requires a "pipeline that is under cathodic protection" to be "tested at least once each calendar year, but with intervals not exceeding 15 months, to determine whether the cathodic protection meets the requirements of § 192.463."

these leads every twelve to fifteen months; however, she stated that Acadian typically tests them twice a year to ensure that the wires are in proper working order and the currents are readable. She explained that Acadian determined where access was required to reach these leads after construction was completed due to the fact that adjustments during construction might affect the actual location of the pipeline.

Ms. Kerls testified that there are four test leads on the Defendants' property. She stated that once the pipeline was completed, Acadian's technicians requested and were granted permission from Ricky McMickens to access the test leads along the route of the proposed servitude. She said that the technicians usually accessed the site by truck or side-by-side and then traveled to each test lead in the same manner or by foot. Ms. Kerls testified that the route of the proposed servitude is approximately 19,000 feet in length and is maintained by Mr. McMickens. She claimed that he has denied Acadian access to the route in the past because the ground was too wet.

Ms. Kerls testified that she became aware at some point that Mr. McMickens denied Acadian access to the route due to an unresolved timber damages claim dating from the construction of the pipeline. Once she determined that the these were never paid, she said that she contacted Mr. McMickens and negotiated a settlement. However, she admitted that it was this denial of access that triggered her decision to seek a permanent servitude across the Defendants' property. Ms. Kerls testified that it was in Acadian's best interest to seek access via a permanent servitude so that access could not be denied if the property was ever sold. She claimed that she began looking at access options in 2014.

In choosing a route, Ms. Kerls testified that she reviewed aerial desktop photographs, attempted to access the location from different areas, and met with Mr. McMickens to discuss the best route. She stated that she also considered several

7

factors: cost, land impact, safety, and efficiency. She stated that access from Interstate 49, which is located east of the Defendants' property, was impeded by a railroad track and a water body. Ms. Kerls testified that she studied several options for accessing the Defendants' property: (1) from Highway 165, across Dr. Thompson's property; (2) over a City of Alexandria water line right-of-way located on the Defendants' property; and (3) over the proposed route.

Ms. Kerls explained that she dismissed the access route from Highway 165 mainly due to the high cost associated with the route. This route crosses Dr. Thompson's property, located west of the Defendants' property, and runs along Acadian's pipeline servitude. Although she estimated that the route is less than a mile in length, she opined that its use would be impossible because of the presence of a branch of Willow Bayou and a drainage ditch bordering the Defendants' property. Ms. Kerls testified that she also determined that it would be more expensive to use this route because Acadian would have to obtain permits and build bridges over the two water bodies. Once she reached this determination, she admitted that she made no further effort to research the route. Although she had no specific knowledge of the cost or effort involved in utilizing this route, she stated that Acadian's operations group had determined that it would be expensive based on work it had performed in other areas.

When questioned regarding the other factors playing a part in her decision, Ms. Kerls testified, "if we did bridging, there would be . . . more of a safety issue than if we . . . used an existing access route and . . . we wanted to also try to insure that we could get to the right-of-way in an efficient manner." She stated further, "our thoughts are that anytime that you're having to access via any type of bridging that is certainly . . . you have the potential to have more hazards then when you're - then when we're not[.]" Although Ms. Kerls admitted that she had never personally

8

been on the Defendants' route, which she described as more of a path than a road, she agreed that it contained numerous water crossings. However, when asked if these water crossings, which were nine in number, presented hazards, she stated, "You know, we just have to do what we feel is . . . the safest way and an established route that has been used is . . . we consider that a pretty safe route." When questioned again, she stated, "I think we're going to have to cross water bottoms no matter where out there."

Ms. Kerls testified that Acadian accessed its pipeline on Dr. Thompson's property from Highway 165, which access was incorporated into its pipeline servitude. Despite the location of Willow Bayou near Highway 165, she stated that the only water body Acadian's technicians had to cross, in order to perform maintenance on this section of the pipeline, was the drainage ditch. Although she first declared that Acadian was "not permitted to bridge or put a culvert in that particular canal[,]" she acknowledged that she never researched whether a permit was obtainable or even required.

After reviewing all of the information, Ms. Kerls testified that she determined that the proposed route was the best route to access the pipeline. Although she had only seen the route in aerial photographs, she testified that it would be less expensive, safer, and more efficient for Acadian to use this route because it was already established and in use. Ms. Kerls further asserted that this was the preferred route of Mr. McMickens, who pointed it out to the surveyors who surveyed the property as part of the appraisal. Other than mentioning the possibility of the existing City of Alexandria's right-of-way, she provided no further information as to the suitability of this route.

Ms. Kerls testified that she met with Mr. McMickens and discussed the possible routes with him. She stated that once she determined that the proposed

9

route was the best route, Acadian made an initial offer,[2] which the Defendants countered with an offer of $175,000.00. Based on the counter-offer, Ms. Kerls' contact report indicates that Acadian decided to obtain an appraisal of the servitude, which ultimately valued the servitude at $10,925.00. She stated that she again met with Mr. McMickens to try to reach a settlement amount closer to Acadian's initial offer. Ms. Kerls stated that on August 17, 2016, she sent out Acadian's final offer of $23,029.17 to the Defendants, which exceeded the fair market value of the servitude that she asserted was established by the appraisal. Once the Defendants refused this offer, she stated that Acadian proceeded with the litigation at issue.

Ms. Kerls testified that Acadian completed construction of the pipeline in 2011, and that access for maintenance would have been considered during the original planning for the pipeline. She agreed that Acadian's pipeline has been in operation for ten years and that it is only now that it seeks access for maintenance of the pipeline, which, she admitted, would be the second servitude Acadian has on the Defendants' property. Ms. Kerls further agreed that had Acadian originally sought both the pipeline servitude and an access servitude, the Defendants would have been presented with a larger project because the combination would have nearly tripled the amount of property taken. She stated that the proposed route, which is 3.6 miles long, is significantly longer than the Highway 165 route, which is less than a mile in length.

Ms. Kerls testified that the proposed servitude is twenty feet wide, and although the pipeline is forty-two inches wide, the actual pipeline servitude is fifty feet wide. Thus, she agreed that the remaining forty-five feet of the pipeline servitude included enough room to build a maintenance road, without building on

---

[2] The contact notes of Justin McCown, the contract land representative, indicate that this offer was in the amount of $6,000.00.

top of the pipeline. However, she said that Acadian would probably not build a twenty-foot-wide road because it would need room to perform maintenance, which could include digging and placing dirt on the servitude.

Justin McCown, a land representative for Suncoast Land Services, testified that he was contracted by Acadian to perform right-of-way services, including the acquisition of general property rights, rights-of-way, and temporary work-space access agreements. He stated that he was involved in Acadian's negotiations with the Defendants for the proposed servitude and that he rode over the proposed route with Mr. McMickens. Mr. McCown testified that the route, which begins at the northernmost end of the Defendants' property, started as a blacktop surface and then changed to a gravel and dirt path through the 300 acres devoted to farmland. He stated that once the route entered the 1,150 wooded acres, it continued as mostly a grass path up to the pipeline servitude, with bridges over two water bodies made out of a mixture of wood and metal culverting.

Mr. McCown testified that Mr. McMickens denied Acadian access to the proposed route due to an unresolved timber damages claim on April 29, 2015. He stated that when contacted, Mr. McMickens at first refused access, but then relented once he was assured that Acadian would look into the matter of the unresolved damages. Mr. McCown testified that he was not aware of any other time that Mr. McMickens denied Acadian access over this route, and he said that it has continued to use the route with Mr. McMickens' permission.

Mr. McCown testified that Mr. McMickens indicated to him that rather than having a permanent servitude over their property, he and his family wished that Acadian would continue to access the property via the gentlemen's agreement currently in place. However, Mr. McCown admitted that the proposed servitude reflected Mr. McMickens' preferred route across their property. He further admitted

11

that the gentlemen's agreement between the Defendants and Acadian was not in writing and that if access over the route was denied by the Defendants, Acadian would not be able to access the pipeline servitude from Highway 165 unless it built bridges over the two water bodies impeding that route.

The remaining information elicited from Mr. McCown was contained in his contact notes. Mr. McMickens initially denied access to Acadian's technicians on April 29, 2015, based on the unresolved timber damages claim. However, once he was assured by Mr. McCown that Acadian would look into his claim, he relented and granted access. At that time, Mr. McCown informed Mr. McMickens that Acadian would probably want permanent access across their property to the pipeline since access was limited due to the bayous and sloughs surrounding their property.

On May 7, 2015, Acadian's technicians completed their inspection of the test leads located on the Defendants' property. Mr. McCown again informed Mr. McMickens that Acadian was interested in acquiring the right to permanently access their property two-to-three times a year for routine maintenance and in the case of an emergency. He informed Mr. McMickens that Acadian wanted an agreement to use the access route "as is," but that it would repair any damage to the road resulting from its use.

On May 11, 2015, Mr. McCown emailed Mr. McMickens to thank him for assisting Acadian's technicians in accessing the pipeline. He further stated that he was attaching aerial photographs outlining two routes that Acadian was considering for a proposed servitude across their property. One of the routes followed the City of Alexandria water line right-of-way and the other was the proposed route. Mr. McCown requested that Mr. McMickens determine a price for Acadian's acquisition of this servitude.

On August 7, 2015, Mr. McCown contacted Mr. McMickens to set up a meeting to discuss the timber damages and the proposed servitude. He stated that he offered $40,000.00 to settle the timber damages, but that Mr. McMickens concluded that this amount would not cover his timber losses. Mr. McCown told Mr. McMickens that Acadian's operations group was "concerned with the overall safety of the [pipe]line if an emergency situation were to occur and they would not be able to get back to the [right-of-way] due to restricted access." He further told Mr. McMickens that the operations group had "concerns with access due to the property being very inaccessible and landlocked from the large canals on both ends of the property." Mr. McMickens stated that he and his family were not in favor of Acadian having a servitude across their property and that they wished to continue with access via the gentlemen's agreement.

On August 11, 2015, Mr. McCown contacted Mr. McMickens and informed him that Acadian's operations group was "adamant about coming to [a] written agreement due [to] several concerns as discussed previously and we hope to continue working with [him] and his family to get an agreement." He further reported that Acadian agreed to pay $50,000.00 for the Defendants' timber damages, but that it wanted the purchase of the proposed servitude to be included in that amount. Mr. McCown noted that Mr. McMickens did not want to include the servitude in the payment for the timber damages claim.

On August 26, 2015, Mr. McCown met with the Defendants to settle the timber damages claim. At that meeting, he notified them that he was authorized to offer them $6,000.00 for a servitude across their property. He stated that Mr. McMickens asked if that was $6,000.00 per year, but he informed him that this was a one-time payment. Mr. McCown "reiterated all of Acadian's concerns regarding restricted access and that [the Defendants] could sell the property and their

13

'gentlemen's agreement' would be subject to the next owner's approval." He noted that Mr. McMickens said that as long as he was alive, he would never sell the property and that they wanted to continue with the gentlemen's agreement. Mr. McCown noted that the Defendants gave no answer to the offer or to a request to survey the access route. He determined that the Defendants wanted to review the offer, so he told them that he would contact them soon to receive their answer.

On September 9, 2015, Mr. McCown contacted Mr. McMickens regarding Acadian's survey request and to see if he had reviewed its offer for the proposed servitude. He noted that Mr. McMickens had not reviewed the offer because he and his family were not interested in having a servitude across their property. Mr. McCown told Mr. McMickens that "Acadian wants access that is reliable however also access that is the least impact to you on the property so he could be there to determine a preferred route to survey." Mr. McMickens asked if Acadian "ever thought about putting a permanent large culvert in the canal between the Norm Thompson tract and his where Acadian could access from Norm Thompson?" He stated that he told Mr. McMickens that Acadian "looked at it but ultimately they are more interest [sic] in having direct access to his property." He stated that Mr. McMickens then agreed to a survey of the access route.

On September 17, 2015, Mr. McMickens met with Mr. McCown and a survey crew and rode along his preferred route for the proposed servitude. On January 18, 2016, Mr. McCown emailed a copy of the survey plat to Mr. McMickens, indicating that the access route was 19,031.61 feet long and twenty feet wide, equaling a total of 8.74 acres. He further noted that Acadian was offering the Defendants $2,627.00 per acre for a total of $22,959.98 for the servitude. When Mr. McCown contacted him on February 1, 2016, Mr. McMickens again stated that the Defendants were not interested in having a servitude across their property. Mr. McCown stated that he

14

told Mr. McMickens that if Acadian's offer was not acceptable, it was willing to consider a counter-offer. On March 10, 2016, Mr. McMickens presented Acadian with two options:

Option 1:
Acadian can culvert/bridge the canal that borders the property line between his tract and the north adjacent Norm Thompson's land. He said he spoke with Norm on that and that Norm would have no concerns with it. Mr. McMickens noted that Acadian had no issues getting through the ROW during construction when they culverted the canals at that time, why didn't they leave a permanent road in the ROW?

Option 2:
He said if Acadian wants a servitude along the proposed servitude route then their price is $20,000.00/acre equivalent to about $175K (19,031.61' L x 20' W = 8.738 acres). He said he understood that some landowners around him were getting $20,000.00 per acre for temp workspace during construction and he was not offered that much and that has stuck with him since then, so now he is asking $20,000.00 to compensate for what he was shorted during construction. He said if we want a perpetual agreement like proposed instead of an annual agreement then he has to think very long term with his price.

With regard to Option 1, Mr. McCown noted that he told Mr. McMickens that there was no direct access from Highway 165 across Dr. Thompson's property due to the presence of additional bayous or sloughs on his property and that Acadian might also be seeking access across that property in the future. He further noted that there might be environmental issues involved and that Acadian would "rather come up with a solution with [him] and his family since our current access issue lies on his property." As to Option 2, Mr. McCown stated that the Defendants' $175,000.00 counter-offer was well out of the range that Acadian would pay, and if that was the price they sought, it would be more feasible to seek expropriation. He stated that although the price of expropriation was significant, Acadian would only negotiate to the extent that it felt comfortable outside of expropriation. Mr. McCown then asked if the Defendants would accept $50,000.00. Mr. McMickens reiterated that their price was $175,000.00.

15

On June 20, 2016, Mr. McCown contacted Mr. McMickens to set up a meeting with him and Ms. Kerls to discuss Acadian's offer for the proposed servitude based on its appraisal. At the June 21, 2016 meeting, they explained that the servitude appraised for $10,925.00 or $1,250.00 per acre and that their offer of $23,000.00 or $2,627.00 acre was more than twice the appraised value. They further explained that if Acadian was awarded the proposed servitude through expropriation, the amount awarded to the Defendants would likely be based on the appraised value. Mr. McCown noted that they indicated to Mr. McMickens that Acadian was being more than fair and that considering his counter-offer being equivalent to $20,000.00 per acre, it would be more cost efficient for Acadian to seek expropriation rather than pay $175,000.00. Mr. McCown reported that Acadian was still willing to work with the Defendants, but that it would not agree to pay $175,000.00. He further reported that Acadian had found no evidence that any landowner was paid $20,000.00 per acre for temporary workspace during construction and that this amount was more than Acadian had paid for the land upon which the pipeline was constructed.

Mr. McMickens was told by Ms. Kerls that it would not be cost efficient for Acadian to culvert the parish canal adjacent to their property and that in addition to presenting environmental concerns, a permit from the Corps of Engineers might be required to perform the work. Mr. McMickens stated that his family would not accept the $2,627.00 per acre offered by Acadian and that they would only allow access over the proposed route on the condition that it agreed to annual or term payments, with the inclusion of maintenance requirements. Ms. Kerls informed Mr. McMickens that Acadian, in general, would not enter into a term agreement. However, she said that if the Defendants would counter offer with a reasonable term agreement, they would present it to Acadian for consideration. Mr. McMickens stated that he would discuss the matter with his family and then get back with them.

16

Mr. McCown contacted Mr. McMickens on June 30, 2016, regarding a proposed term agreement. However, he stated that Mr. McMickens reported that their attorney would be handling this matter for them in the future.

Mr. McMickens, who represented his father and brothers in this matter, testified that they own approximately 1,405 acres in Rapides Parish, of which 300 acres is used as farmland. He said that the remaining acreage, consisting of wetlands, is in a Conservation Reserve Program (CRP), through which the federal government pays them to reforest the land. He stated that this portion of the property is also used for recreation and hunting. Additionally, Mr. McMickens testified that two pipelines, owned by Exxon and CrossTex, respectively, and a City of Alexandria water line right-of-way are also located on their property. He stated that although Acadian wants a servitude for access, he and his family would rather continue with access based on a gentlemen's agreement, which is how the other companies access their pipelines. He stated that he also requested that Acadian consider accessing its pipeline from Highway 165, which he estimated is located four times closer to the pipeline.

Mr. McMickens testified that the pipeline, which is located on the southernmost portion of their property, runs from east to west before crossing a man-made drainage ditch, which is located fully on Dr. Thompson's property. Once on Dr. Thompson's property, he stated that the pipeline turns and goes straight to Highway 165. He said that a portion of Willow Bayou is located near Highway 165 on Dr. Thompson's property.

Mr. McMickens testified that Acadian surveyed the property for the pipeline servitude between 2008 and 2009, and that his family eventually reached an agreement to sell it 9.79 acres of permanent land at $17,500.00 per acre and 13.03 acres of temporary land at $2,100.00 per acre. He stated that Acadian also agreed to

pay a separate amount for timber damages. Mr. McMickens testified that the check that he received from Acadian included an amount for damages, which were not timber damages. He stated that he considered refusing the check until he was assured that Acadian would have a timber man appraise their timber losses and issue separate checks for those damages.

Mr. McMickens testified that during construction, Acadian accessed the pipeline servitude from Highway 165 by building a temporary bridge across the drainage ditch from Dr. Thompson's property. He stated that it never accessed the pipeline servitude over the proposed route. He said that he was approached by Acadian approximately one year after construction concluded about gaining access to the pipeline over their property due to drainage issues. Mr. McMickens testified that the proposed route was developed by putting culverts in some of the deeper ditches, which were paid for by Acadian. Once it started using this route, he stated that Acadian usually sought access once or twice a year. He stated that every time it asked for access, he granted permission, but also reminded it about the unsettled timber damages. Other than the time that he denied access due to the timber damages, he said that he only delayed access one time because the property was too wet.

Mr. McMickens testified that after the timber damages claim was settled, Acadian notified him that it was seeking a permanent servitude to access its pipeline on their property. He stated that it first offered him and his family $5,000.00 or $6,000.00 for a servitude; however, he said that none of his family wanted a servitude that would permanently affect them or future owners of the property. Mr. McMickens testified that he did not think it was fair for Acadian to have a 3.6 mile servitude across the entire length of their property when it already had access over a servitude that was less than a mile in length.

18

Mr. McMickens further disagreed that a servitude would not adversely affect the property's value. He asserted that it would affect the property's value, just as the pipeline did, although he thought that the pipeline affected the property's value less since it was located in the southernmost portion of the property. Moreover, he said that he was not interested in selling the land for $2,500.00 per acre. Although Mr. McMickens testified that he had no plans to change the use of the property, he stated that he might need to sell it should his situation change in the future. If he did so, he stated that he would want to sell the property for the highest price he could obtain, and he felt that the proposed servitude would affect that price. Moreover, he said that if he wanted to eliminate or change the location of the current route, he could do so; however, with the servitude, he would lose that right.

Mr. McMickens testified that his family would rather continue granting access to Acadian through the gentlemen's agreement. He said that they also had gentlemen's agreements with the other two pipelines and the water lines that cross their property. However, he said that none of these entities requested twice yearly access. Mr. McMickens further denied that he ever told Acadian that he wanted the servitude to follow the proposed route. While he admitted that he pointed the route out to the surveyors, he stated that this occurred at a time when he was still trying to get Acadian to pay for the timber damages.

Mr. McMickens described the proposed route as a substandard road that his family uses to access the rear of their property for recreational purposes. He stated that the road through the northern 300 acres of farmland is an established surface with banking and drainage ditches, which the leasing farmer maintains. Mr. McMickens testified that Acadian has never offered to help maintain the route and, based on its past performance, he has no faith that it would do so. He stated that he maintains the route by bush hogging it four to five times a year, trimming the trees

along the route, and keeping the path clear of fallen trees or limbs. He said that he stays off of the route when it is wet or accesses it by ATVs or side-by-sides. Mr. McMickens testified that he also currently maintains the pipeline right-of-way. He said that he did so initially because he was trying to get Acadian to settle the timber damages claim and because locust trees were growing in the temporary portion of the land used by Acadian. He stated that he no longer wants to maintain it because the number of ditches along the pipeline make it hard to bush hog.

Mr. McMickens testified that the 1150 acres that are in the CRP are also wetlands. He stated that they are not allowed to improve the property unless they remove it from the CRP. Thus, they are unable to build or pave a road unless the road preexisted the property being put into the CRP.

Mr. McMickens testified that he has no plans to develop the property currently used for farmland, but that he has plans to build a home on the property in the future. Thus, he described the property as an extension of his backyard. He further stated that a permanent servitude would not be fair to his family or any future owner, especially since Acadian already has access from Highway 165, which is a much shorter route, and via the gentlemen's agreement over the proposed route.

Dr. Thompson testified that he owns the property next to the Defendants' property and that Acadian has a pipeline servitude across his property from Highway 165 to the Defendants' property. He stated that during construction of the pipeline, Acadian accessed the pipeline servitude from Highway 165, by crossing both Willow Bayou and the drainage ditch located between his and the Defendants' properties. He stated that Willow Bayou is located 125 yards from Highway 165 and that it took Acadian one day to build a bridge across it. He said that it only took Acadian half of a day to bridge the drainage ditch. Dr. Thompson further testified that during the summer months both Willow Bayou and the drainage ditch are

20

typically dry enough to drive across. On the day of his testimony, he stated that the water in Willow Bayou was eighteen inches deep and could be forded by either a Polaris or a tractor. He further stated that he had seen Exxon's technicians cross the drainage ditch in order to access its pipeline on the Defendants' property.

Dr. Thompson testified that Acadian, when performing maintenance, accesses the pipeline on his property from Highway 165. He said that it either crosses Willow Bayou or, if the water is too high, it drives a half-mile to his driveway, where he has a culverted crossing across Willow Bayou. Dr. Thompson testified that there are two other pipelines located on his property and that both pipeline companies access their pipelines in this manner.

In denying Acadian's request for a servitude over the Defendants' property, the trial court held that Acadian selected the location for the servitude in a manner that was arbitrary, capricious, and in bad faith. It found that Acadian only sought the servitude after Mr. McMickens denied access on one occasion in order to bring the issue of the unpaid timber damages to its attention. It further held that Acadian failed to fully investigate two other available routes, but instead, chose the "easiest and least expensive route" over the Defendants' property.

After reviewing the record, we find no manifest error in the trial court's factual conclusions that the Defendants proved that Acadian acted arbitrarily, capriciously, and in bad faith in choosing the route over their property for its servitude. That burden required that the Defendants prove that Acadian "exercised its large discretion without consideration or adjustment with reference to principles, circumstances or significance." *Red River Waterway*, 566 So.2d at 83.

The facts established that Acadian is ten years into the operation of its pipeline and that it has utilized the route in question with the Defendants' permission when performing maintenance for approximately nine years. It only sought acquisition of

21

the servitude because the Defendants denied access on one occasion in an effort to obtain payment of their unresolved timber damages. Although Mr. McMickens mentioned the issue several times to Acadian's technicians, it was only when he denied access on April 29, 2015, that he was able to bring this matter to resolution. However, that denial ultimately led to Acadian's suit for expropriation.

In determining that the proposed route was the best route for Acadian to use in accessing its pipeline for maintenance purposes, the majority of Ms. Kerls' testimony centered around the cost involved in utilizing the routes under consideration. The facts established that there were at least two routes, and possibly three, by which it could access that section of pipeline located on the Defendants' property: the two primarily discussed at trial were the Highway 165 route and the proposed route. Although Ms. Kerls discussed a third possible route over the City of Alexandria's water line right-of-way, nothing further was said in regard to this route.

At the outset, it would cost more for Acadian to use the proposed route, as the route from Highway 165 is already incorporated into Acadian's pipeline servitude; thus, it would cost Acadian nothing to use this route. The proposed route over the Defendants' property is not incorporated into Acadian's pipeline servitude and would cost, at the least, $10,925.00 in additional funds to acquire. Moreover, this would result in Acadian owning two servitudes on the Defendants' property.

Although Ms. Kerls concluded that it would cost more to use the Highway 165 route due to the location of Willow Bayou and the drainage ditch on Dr. Thompson's property, both her testimony and Dr. Thompson's testimony established that Willow Bayou had already been bridged by Dr. Thompson through the placement of a culvert. Thus, the only water body possibly impeding access would be the drainage ditch. However, according to Dr. Thompson, this ditch is

22

usually dry during the summer and can be crossed by the type of vehicles that Ms. Kerls said Acadian's technicians typically use. He further stated that he has seen Exxon's technicians cross this drainage ditch in order to access its pipeline on the Defendants' property.

Acadian's technicians sought access to the Defendants' route on April 29, 2015, and actually accessed the pipeline on May 7, 2015. Although the spring months are generally wet and might present difficulties for crossing the drainage ditch, the testimony established that Acadian has no set time for performing maintenance on its pipeline, as long as it is performed once or twice a year. In fact, there was evidence that even the Defendants' route was too wet at times to provide access to the pipeline. In those cases, maintenance was delayed to a time when the ground had dried sufficiently to afford access; and the record was devoid of any evidence that these delays presented a problem to Acadian.

According to Mr. McCown's contact notes, Mr. McMickens received permission from Dr. Thompson for Acadian to bridge the drainage ditch with a culvert. Despite Mr. McCown's knowledge of this, Ms. Kerls first claimed that Acadian was not permitted to bridge the ditch, but then stated that building such a bridge would require a permit from the Corps of Engineers. However, because she failed to perform any research on the issue of permits, she admitted that she had no knowledge of what it would take to obtain a permit, what it would cost to build a bridge, whether a culvert was adequate, or even whether such a permit was required for a privately-owned ditch. Thus, there was sufficient evidence within the record for the trial court to conclude that Acadian failed to consider the costs of utilizing the existing Highway 165 route across Dr. Thompson's property in order to reach its pipeline on the Defendants' property. Further, there was no evidence showing that any consideration was made by Acadian with regard to the third proposed route over

23

the City of Alexandria's existing water line servitude located on the Defendants' property.

Next, although Ms. Kerls claimed that she considered environmental impact and safety issues in reaching a determination as to the best route for Acadian's use, her testimony was devoid of any explanation as to how environmental impact played a part in her determination. With regard to the issue of safety, she merely explained that crossing a bridge presented the potential for safety hazards. But, when questioned regarding the nine water crossings located on the Defendants' route, she admitted that Acadian's technicians would have to traverse water crossings no matter which route was used. Moreover, the route over the Defendants' property is 3.6 miles long, whereas the route from Highway 165 is less than a mile in length. Thus, there is evidence within the record to support the trial court's conclusion that Acadian failed to adequately consider environmental impact and safety factors in determining the location and extent of the proposed servitude.

Finally, Ms. Kerls made no mention of whether she considered long-range-area planning in determining that the proposed route was the best route for Acadian to use in accessing its pipeline. Her only comment regarding long-range planning was that Acadian wanted to acquire the servitude at issue in order to ensure that it would have access to its pipeline in the event that the Defendants' property was sold in the future. However, Mr. McMickens stated that he had no intention of selling the property during his lifetime. Given the lack of evidence on this issue, we again find that the trial court could reasonably conclude that there was inadequate consideration by Acadian with regard to this criteria.

Mr. McMickens was adamant that neither he nor his family wanted this servitude on their property contrary to Ms. Kerls' claim that the proposed route was Mr. McMickens' preferred route because he pointed it out to the surveyors when

24

Acadian performed its survey. This fact was substantiated by Mr. McCown. In fact, Mr. McMickens admitted that he only pointed out the route to the surveyors because he was still trying to reach a settlement with Acadian over the unresolved timber damages. Moreover, the evidence established that Mr. McMickens questioned several times whether Acadian could access its pipeline over the Highway 165 route. Finally, Mr. McMickens stated that he and his family would rather Acadian continue using the route with their permission via gentlemen's agreement, rather than having a servitude extending nearly the length of their property, especially since the pipeline was located at the southernmost end of the property.

The Defendants are amenable to Acadian using the existing route with their permission, which it happily did for nine years without the need for a second permanent servitude, and the only circumstance which changed during this time was the Defendants' denial of access on a single occasion as a result of the unpaid timber damages claim. Further, Acadian already has access for maintenance purposes along the existing pipeline servitude it purchased from the Defendants in 2010, as well as the Highway 165 route over Dr. Thompson's property, which is less than one mile in length.

Both our constitution and jurisprudence reflect the need for and importance of the expropriation process for the benefit of our government, citizens, and commerce. Although great discretion is left to the expropriating entity, the jurisprudence requires that the expropriating entity act carefully and deliberately in determining the need to expropriate, as well as the extent and location of the property to be expropriated. While the availability of other feasible locations for the servitude is not, in and of itself, an indication that the expropriator has acted arbitrarily, capriciously, or in bad faith in making its selection, the expropriating agency can

25

abuse its discretion by acting without considering and weighing the relevant factors, that is, by acting arbitrarily. *See Red River Waterway*, 566 So.2d 79.

In this case, the trial court concluded, based upon the evidence presented, that Acadian acted arbitrarily, capriciously, and in bad faith in seeking a servitude over the proposed route. The trial court found that "much of the testimony, of the Acadian expert and the company representative, was self-serving in that their exploration of actual alternative routes was just a farce when they simply want to take the easiest and least expensive route for the company—the already owner developed path" and that the ultimate decision by the company to seek the servitude "was prompted by the timber damage dispute and not the actual need for a permanent route." Based upon our review of the record in its entirety, the trial court's findings are reasonable, and thus we cannot conclude that the trial court was manifestly erroneous or clearly wrong. *See Moncrief*, 939 So.2d 714.

Accordingly, we find no merit in Acadian's first two assignments of error and affirm the trial court's judgment in favor of the Defendants. Based on this finding, we need not address Acadian's third assignment of error nor the Defendants' motion to strike and for a partial dismissal of Acadian's appeal.

## DISPOSITION

For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed to Acadian Gas Pipeline System.

**AFFIRMED.**