# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CA 24-544

**LOUISIANA ENERGY GATEWAY LLC**

**VERSUS**

**TRUNKLINE GAS COMPANY, LLC**
**DAPL-ETCO OPERATIONS MANAGEMENT, LLC**
**ENERGY TRANSFER CRUDE OIL COMPANY, LLC**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. C-2023-0915
HONORABLE C. KERRY ANDERSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**GUY E. BRADBERRY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Candyce G. Perret, Jonathan W. Perry, and Guy E. Bradberry, Judges.

**AFFIRMED.**

**H. Alston Johnson, III**
**Brad M. Boudreaux**
**Kevin W. Welsh**
**Anthony J. Gambino, Jr.**
**Nena M. Eddy**
**Phelps Dunbar LLP**
**400 Convention Street, Suite 1100**
**Baton Rouge, LA 70802**
**(225) 346-0285**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Louisiana Energy Gateway LLC**

**Christopher P. Ieyoub**
**Plauche, Smith & Nieset**
**1123 Pithon St.**
**Lake Charles, LA 70601**
**(337) 436-0522**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Louisiana Energy Gateway LLC**

**Jodi C. Andrews**
**Lestage & Andrews LLC**
**113 N. Washington Street**
**DeRidder, LA 70634**
**(337) 460-7987**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Louisiana Energy Gateway LLC**

**Kay Cowden Medlin**
**Leland G. Horton**
**Joshua S. Chevallier**
**Bradley Murchison Kelly & Shea LLC**
**401 Edwards Street, Suite 1000**
**Shreveport, LA 71101-5529**
**(318) 227-1131**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Trunkline Gas Company, LLC**
    **Energy Transfer Crude Oil Company, LLC**
    **DAPL-ETCO Operations Management, LLC**

**BRADBERRY, Judge.**

Trunkline Gas Company, LLC, Energy Transfer Crude Oil Company, LLC, and DAPL-ETCO Operations Management, LLC (collectively referred to as ETP) appeal a trial court judgment granting a permanent injunction permitting Louisiana Energy Gateway LLC (LEG) to install a forty-two inch pipeline under seven pipelines owned by ETP at three servitude locations in Beauregard Parish. ETP argues that LEG needs its consent to cross its pipelines. In addition to issues regarding the granting of the permanent injunction on two of the servitudes, ETP raises issues regarding discovery and recusal of the trial court judge. For the following reasons, we affirm the judgment of the trial court.

## FACTS

The Louisiana Energy Gateway project consists of an approximately 176-mile natural gas pipeline extending from northeast Texas to southwest Louisiana. LEG is a subsidiary of Williams Companies, Incorporated, the builder of the pipeline. Along this pipeline route, the LEG pipeline will cross the existing ETP pipeline at approximately forty-two locations. This appeal concerns the crossings in Beauregard Parish. At that point, the LEG pipeline is a forty-two inch pipeline. Other segments of pipeline along the route are thirty and thirty-six inches. The purpose of the LEG pipeline is to decrease bottlenecks by gathering natural gas in the Haynesville Basin for additional production growth. The LEG system will create 1.8 billion cubic feet per day of additional natural gas gathering capacity in Louisiana.

To construct the forty-two inch pipeline, LEG obtained pipeline servitude rights in Beauregard Parish. On December 16, 2022, Williams entered into a pipeline servitude and right-of-way agreement with Delanie P. Cooley and John

Dwayne Cooley, where it was granted a fifty-foot wide servitude to construct one natural gas pipeline. On May 2, 2023, LEG entered into a pipeline right-of-way grant with C. Doornbos Louisiana, LLC, in which it was granted a fifty-foot wide servitude to construct one natural gas pipeline. On May 17, 2023, it entered into a pipeline servitude with Larry Eugene Welborn, where it was granted a fifty-foot wide servitude to construct one natural gas pipeline.

On May 23, 2023, an email was sent to ETP by Williams concerning forty-two proposed crossings of ETP's pipeline for the LEG project. Also attached was documentation concerning the pipeline. The email noted that if a response was not received by June 6, 2023, then that would be an indication of no objections to the proposed crossings. ETP followed with an email on May 31, 2023, requesting additional documentation and objecting to all proposed crossings. On June 7, 2023, Williams sent additional documentation to ETP as requested. LEG was advised by ETP that it objected to all of LEG's crossings.

On November 22, 2023, LEG filed a petition requesting preliminary and permanent injunctive relief against ETP and Centennial Pipeline, LLC. LEG sought injunctive relief asking that ETP be enjoined from any action that impedes, interferes with, or obstructs construction, operation, or maintenance of its rights under the servitudes. On January 8, 2024, a hearing was held on ETP's motion for dilatory exception of unauthorized use of summary proceedings. On that same day, a scheduling order was entered setting the permanent injunction hearing for March 18, 19, and 20, 2024. On January 22, 2024, a judgment was entered granting the exception of unauthorized use of summary proceedings filed by ETP and ordering that the matter proceed using ordinary process.

On February 15, 2024, ETP filed a motion for partial summary judgment seeking a judgment that its rights under two of its servitudes are adversely affected by the rights granted to LEG. The Switzer servitude was granted to ETP in 1950 on the same property that the Welborn servitude was granted to LEG. The Pullin servitude was granted to ETP in 1950 on the same property that the Cooley servitude was granted to LEG.

On February 15, 2024, ETP also filed a motion to compel discovery and asked for an extension on discovery deadlines arguing that it needed more information from LEG in order to have a full and fair trial. A hearing was held on February 16, 2024. A judgment was signed on March 8, 2024, granting the motion in part, and denying it in part. LEG was ordered to amend and supplement some of its responses on or before February 20, 2024, and some of the requests were denied. The trial judge denied ETP's request to continue the trial and extend discovery deadlines.

On February 20, 2024, ETP filed a motion to recuse Judge Kerry Anderson. ETP argues that Judge Anderson was party to a servitude with one of its affiliates, Gulf Run Transmission. It argues that there was similar litigation between Gulf Run and LEG in different parishes. LEG opposed the motion noting that it was different litigation not involving the LEG project. A hearing on this motion was held before Judge John Conery on March 7, 2024, who denied the motion to recuse.

Writs on the discovery ruling were taken to this court. On March 15, 2024, this court found no abuse of discretion in the trial judge's rulings and denied the request for a stay as moot.

A hearing was held on ETP's partial motion for summary judgment and LEG's request for a permanent injunction on March 18 and 19, 2024. The trial judge denied ETP's motion for partial summary judgment based on material issues of facts

3

to be decided at trial. At the end of the hearing, the trial judge took the matter of the permanent injunction under advisement. On June 3, 2024, the trial judge issued written reasons for ruling. Judgment was signed on June 14, 2024. ETP's motion for partial summary judgment was denied. The judgment granted LEG's petition for permanent injunction. ETP then filed the present appeal.

ETP has asserted several assignments of error on appeal. Two deal with preliminary hearing matters regarding the recusal and discovery matters. We will address these matters first, since a ruling on these issues may pretermit a ruling on the other issues raised by ETP.

## RECUSAL

ETP argues that Judge Anderson should have been recused since he personally signed a servitude agreement with its affiliate Gulf Run, which is involved in litigation in another parish with LEG regarding similar issues. LEG argues that Judge Anderson's connection with an ETP affiliate is far too attenuated to warrant recusal.

Louisiana Code of Civil Procedure Article 151 provides the grounds for recusal of a judge. Specific to this case, La.Code Civ.P. art. 151 provides, in pertinent part:

> A. A judge of any trial or appellate court shall be recused upon any of the following grounds:
>
> . . . .
>
> (4) The judge is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys or any witness to such an extent that the judge would be unable to conduct fair and impartial proceedings.
>
> B. A judge of any trial or appellate court shall also be recused when there exists a substantial and objective basis that would

4

reasonably be expected to prevent the judge from conducting any aspect of the cause in a fair and impartial manner.

The denial of a motion to recuse will not be reversed unless the trial court abused its discretion. *Wells Fargo Bank NA v. Jones*, 23-463 (La.App. 3 Cir. 2/7/24), 379 So.3d 1273. There is a presumption that a judge is impartial. *Id*. Louisiana Code of Civil Procedure Article 151 requires a finding of actual bias or prejudice, not one based on a mere conclusory allegation. *Id*.

In denying the motion to recuse, Judge Conery found that there was "no evidence that this would impact Judge Anderson's decision in any way other than the fact that his servitude is with the same group of companies that was taken over by a bigger company." He found that the burden of rebutting the trial judge's presumed impartiality had not been met. Judge Conery further found that LEG's pipeline will not even come close to Judge Anderson's property and there is no suggestion that any pipeline company intends to cross the pipeline on Judge Anderson's property. Judge Conery also noted that "until recently, Gulf Run was a separate and distinct person under Louisiana law and not affiliated in any way with the defendants." Judge Conery stated that there was no evidence that Judge Anderson could not be fair and impartial.

We find no abuse of discretion in Judge Conery's decision that Judge Anderson should not be recused in this case. We see no impact on Judge Anderson's ability to conduct a fair and impartial proceeding simply because he previously granted a pipeline servitude to a company who only recently became an affiliate of ETP before trial. There is simply no evidence to indicate that Judge Anderson would have any bias or prejudice in this matter.

**DISCOVERY**

ETP argues that the trial judge abused his discretion by limiting discovery to a period of only forty days. It claims the trial judge rushed to maintain the trial court date of March 18, 2024, without regard to its rights for discovery.

"[A] trial judge has broad discretion in regulating pre-trial discovery, which discretion will not be disturbed on appeal absent a clear showing of abuse of that discretion." *Bell v. Treasure Chest Casino, L.L.C.*, 06-1538, pp. 3–4 (La. 2/22/07), 950 So.2d 654, 656.

A writ on this discovery issue was taken to this court where this court ruled: "**WRIT DENIED.** We find no abuse of discretion in the trial court's rulings." *La. Energy Gateway, LLC v. Trunkline Gas Co.*, 24-124 (La.App. 3 Cir. 3/15/24) (unpublished writ).

We observe that "[a] considered writ denial constitutes law of the case." *Waller v. State, Dep't. of Health & Hosps.*, 11-643, p. 4 (La.App. 3 Cir. 11/9/11), 79 So.3d 1085, 1089, *writ denied*, 11-2692 (La. 2/10/12), 80 So.3d 488. This court explained that "[a] very marked distinction can be drawn between cases in which writs are simply denied and those in which writs are denied on a finding that the trial court did not err." *Id.* However, "[t]he doctrine of law of the case does not apply in situations in which we find palpable error or in which its application would result in manifest injustice." *Id.*

A review of the hearing on the discovery issue reveals ETP issued discovery on January 9, 2024, and LEG answered on January 25, 2024. There was a disagreement as to what was provided, so LEG continued providing documents. At the hearing on the motion to compel on February 16, 2024, the trial judge took the time to go through each request and hear arguments as to why the information was

6

or was not necessary. He then either ruled that the information must be produced or did not have to be produced. The judgment specifically laid out these rulings on the discovery issues.

We find that the trial judge did not abuse his discretion in ruling on these discovery issues and therefore, find no palpable error.

## SUMMARY JUDGMENT

ETP argues that the trial judge erred in not granting its motion for summary judgment as to the Switzer Servitude and the Pullin Servitude. It argues that it is entitled to summary judgment because LEG cannot establish its title seeking the right to construct crossings on ETP servitudes without ETP's consent. ETP argues that based on the plain and explicit terms of the Switzer Servitude and the Pullin Servitude, ETP has the right to require consent before LEG can construct crossings at those locations. We note that there were three servitudes at issue in the trial court. However, the Doornbos Servitude specifically reserved to the landowner the right to grant additional servitudes and is not at issue on appeal.

A judgment denying a motion for summary judgment is an interlocutory judgment that is not appealable. *Southeast Holdings, LLC v. Mouhaffel*, 21-1176 (La.App. 1 Cir. 9/16/22), 353 So.3d 136, *writ denied*, 22-1539 (La. 12/6/22), 351 So.3d 366. "An interlocutory judgment is appealable only when expressly provided by law, but the denial of a motion for summary judgment may be reviewed in conjunction with other appealable issues for the sake of judicial economy." *Id.* at 143.

An appellate court applies a de novo standard of review in reviewing a trial court's ruling on a summary judgment motion and utilizes the same criteria that the trial court initially employs under La.Code Civ.P. art. 966. *Manecke v. Golden*

7

*Nugget Lake Charles*, 22-590 (La.App. 3 Cir. 3/8/23), 371 So.3d 39. "[A] motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(A)(3).

In the 1950s, ETP acquired several servitudes in Beauregard Parish through Trunkline. Trunkline acquired a right-of-way and easement on July 28, 1950, from George Switzer and Thomas Switzer "to construct lay[,] maintain, operate, alter, repair, remove, change the size of, and replace pipe lines appurtenances thereto (including without limitation Cathodic Protection equipment) for the transportation of oil, gas, petroleum products or any other liquids, gases or substances which can be transported through pipe lines[.]" The agreement further provided that Trunkline had "the right to lay, construct, operate, alter, repair, remove, change the size of, and replace at any time or from time to time one or more additional lines of pipe and appurtenances thereto, said additional lines not to necessarily parallel any existing line laid under the terms of this agreement." The agreement provided that the Switzers could:

> [F]ully use and enjoy said premises except for the purposes herein granted to the said Grantee and provided the said Grantor shall not construct or permit to be constructed any house, structures or obstructions on or over or that will interfere with the construction, maintenance or operation of any pipe line or appurtenances constructed hereunder or will not change the grade of such pipe line.

The parties stipulated that pipelines were constructed by Trunkline pursuant to the Switzer Servitude in 1956, 1961, and 1969.

In 2023, LEG acquired a servitude from Larry Welborn, the current owner of the tract, covering a portion of the same property covered by the Switzer Servitude. LEG wants to cross these three pipelines. One of the pipelines on the Switzer

8

Servitude was assigned to Centennial Operating, LLC. LEG and Centennial entered into an agreement in which Centennial issued a letter of no objection to LEG allowing LEG to cross its pipeline. Centennial was dismissed from the litigation on January 5, 2024.

On June 27, 1950, John Pullin and B.H. Pullin granted Trunkline "a right-of-way and easement to construct, lay, maintain, operate, alter, repair, remove, change the size of, and replace pipe lines and appurtenances thereto (including without limitation Cathodic Protection equipment) for the transportation of oil, gas, petroleum products or any other liquids, gases or substances which can be transported through pipe lines[.]" Trunkline was also given the "right to lay, construct, maintain, operate, alter, repair, remove, change the size of, and replace at any time or from time to time one or more additional lines of pipe and appurtenances thereto." The agreement provided that the Pullins could:

> [F]ully use and enjoy said premises except for the purposes herein granted to the said Grantee and provided the said Grantor shall not construct or permit to be constructed any house, structures or obstructions on or over or that will interfere with the construction, maintenance or operation of any pipe line or appurtenances constructed hereunder and will not change the grade of such pipe line.

Trunkline constructed pipelines under the Pullin Servitude in 1951 and 1978. In 2022, LEG's predecessor entered into a pipeline servitude with Delanie Cooley and John Cooley. The servitude was assigned to LEG in 2023.

ETP argues that neither the Switzer Servitude nor the Pullin Servitude "reserved to the grantors the right to grant pipeline crossings to other parties within the servitude areas." ETP argues that the trial court's determination that whether construction of a new pipeline would interfere with the operation of the existing pipelines are not facts material to deciding its motion for summary judgment. ETP

9

takes the position that "LEG's grantors were without any authority to grant LEG the right to lay pipelines in the areas governed by the Pullin and Switzer Servitudes because those rights were already alienated from the servient estate when ETP's grantors sold them to ETP." ETP argues that it was entitled to summary judgment because its consent is required before LEG can construct crossings at those locations.

The second circuit recently addressed very similar issues in two cases: *ETC Tiger Pipeline, LLC v. DT Midstream, Inc.*, 55,534 (La.App. 2 Cir. 4/10/24), 384 So.3d 458, *writ denied*, 24-763 (La. 10/8/24), 394 So.3d 271, and *ETC Tiger Pipeline, LLC v. Louisiana Entergy Gateway LLC*, 55,913 (La.App. 2 Cir. 10/2/24), ___ So.3d ___, *writ denied*, 24-1350 (La. 1/14/25), 398 So.3d 1168. Both of those cases dealt with the grant of a preliminary injunction by the trial court in favor of the pipeline company with the existing pipeline as opposed to the grant of a permanent injunction in favor of the pipeline company seeking to cross the existing pipelines as in the present case.

In both second circuit cases, the court of appeal held that the servitude granted to the pipeline company was not a predial servitude because it did not involve two estates but rather was a right of use. We agree. As noted by the courts, the rules applicable to usufruct and predial servitudes are both applicable as long as they are compatible with rules governing the right of use servitude. La.Civ.Code art. 645. The right of use grants specific rights to use the property, which can limit the landowner's use of the land to the extent specified in the servitude agreement. La.Civ.Code art. 639. "The right of use may confer only an advantage that may be established by a predial servitude." La.Civ.Code art. 640. A predial servitude is a charge on a servient estate for the benefit of a dominant estate. La.Civ.Code art. 646.

10

As the Louisiana Supreme Court has observed, the right of use servitude is a limited personal servitude that does not give its holder the exclusive use of the land to which the servitude is subject. *Faulk v. Union Pac. R.R. Co.*, 14-1598 (La. 6/30/15), 172 So.3d 1034. The landowner retains ownership of the property, and for a right of use servitude to give its holder exclusive use of the land would convert the limited personal servitude to a right more closely resembling ownership. *Id.* Accordingly, landowners who had granted servitudes to railroads for passage had the right, at the very least, to cross over the tracks when not in use by the railroads to reach their property on the other side. *Id.*

The second circuit cases also found that the use of the word "exclusive" in the servitude agreement did not mean that "servitude includes all depths and can subjectively block the crossing of another pipeline." *DT Midstream, Inc.*, 384 So.3d at 467. In the present case, nothing in the Switzer Servitude or the Pullin Servitude stated that consent from the existing pipeline servitude grantees was required before the landowner could grant additional pipeline servitudes. There is also nothing in the servitude agreements that prevent the crossing by other pipelines. Furthermore, the word "exclusive" is not used in any of the present servitude agreements.

ETP argues that the Switzer Servitude grants it the authority to lay additional pipelines for an additional payment as well as the right to "alter the routes under, upon, over, and through lands which the undersigned owns[,]" establishing it as the only party who has the right to construct pipelines on the Switzer Servitude. However, the Switzer Servitude further provides that:

> Grantor is to fully use and enjoy said premises except for the purposes herein granted to the said Grantee and provided the said Grantor shall not construct or permit to be constructed any house, structures or obstructions on or over or that will interfere with the construction,

maintenance or operation of any pipe line or appurtenances constructed hereunder and will not change the grade of such pipe line.

Obviously, the servitude agreement contemplated the grantor constructing or allowing construction of other structures that **did not interfere with any existing pipelines or structures**.

We find nothing in the Switzer Servitude or the Pullin Servitude that gives ETP the right to require its consent to any future pipeline servitudes granted by the landowner. Furthermore, there is nothing in the servitude agreements that prevents crossings by any other pipelines.

The existence of a right of use servitude does not confer any semblance of ownership of the land burdened with the servitude upon the owner of the dominant estate. Therefore, the servient estate owner can grant additional rights of use as long as these do not infringe upon the existing servitude.

We find no merit to these assignments of error. With this finding, the issue of whether the servitudes prescribed is moot.

### ADVERSE IMPACT

ETP also assigns as error the trial court's finding that LEG's servitudes would not adversely impact their previously existing servitudes. ETP relies on La.Civ.Code art. 720, which provides: "The owner of the servient estate may establish thereon additional servitudes, provided they do not affect adversely the rights of the owner of the dominant estate." Louisiana Civil Code Article 748 further provides: "The owner of the servient estate may do nothing tending to diminish or make more inconvenient the use of the servitude." We also note that La.Civ.Code art. 730 provides that "Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate." ETP

12

argues that the trial judge found that the exercise of its rights regarding its servitudes would be more burdensome if the crossings were constructed, so the trial judge's conclusions allowing the crossings were legal error.

The trial judge's finding that LEG's pipelines crossing ETP's pipelines would have no adverse effect on ETP's pipelines is a factual finding in a civil matter subject to the manifest error/clearly wrong standard of review. *Acadian Gas Pipeline Sys. v. McMickens*, 18-337 (La.App. 3 Cir. 12/28/18), 263 So.3d 524. An appellate court may not reverse a trial court's findings which are reasonable in light of the record reviewed in its entirety. *Id.*

Much of the testimony at the hearing concerned the adverse effect of LEG's pipelines crossing ETP's pipelines. Based on our review of the record, we find no manifest error in the trial judge's ruling that allowed the crossing of ETP's pipelines by LEG.

As the trial court stated, it is clear in the industry that pipeline crossings occur all the time. Prior to the construction of this pipeline, no witness had experienced a pipeline company seeking to block another pipeline company's crossing of its pipeline.

Eric Maelstrom is the project director for Williams, the company managing the construction of the LEG pipeline. Eric stated that ETP was uncooperative from the beginning in the normal process of working on crossings. The pipeline segment at issue in Beauregard Parish is a forty-two inch segment that will be constructed by Price Gregory. Eric testified that the LEG pipeline is running from north Louisiana to south Louisiana to connect into the Transco pipeline and other transmission pipelines in the area and that, to do this, it must cross ETP pipelines. Eric explained that it is a customary practice to lay pipelines next to each other. Eric testified that

the LEG pipeline will, for the most part, parallel the already-existing LEAP pipeline. The LEAP pipeline also gathers natural gas from the Haynesville shale area.

Eric testified that ETP and Williams have experience working together to safely cross each other's pipelines. He explained that LEG plans to cross all of ETP's pipelines safely and in accordance with industry standards and regulations.

One of the concerns with these underground pipelines is long-term integrity, particularly corrosion. Eric testified that there would be no greater risk of corrosion for the pipeline than there would be for any other pipeline. He explained that the primary consideration is liquid water that could enter the pipeline that could result in corrosion. Eric testified that the design of the LEG pipeline will adhere to a limit of seven pounds per million standard cubic feet per day of water vapor to ensure that there is not enough water vapor to form condensation and liquid water in the pipeline. External corrosion is limited by application of a fusion-bonded epoxy or a coating to the external layer of pipe which acts as a barrier to keep any water from contacting the bare steel of the outer surface of the pipe. Additionally, at the crossing, there is an abrasive resistant overlay installed to ensure that the integrity of the fusion-bonded epoxy is maintained when the pipe is slid through the bore drilled areas at the crossings.

Eric also explained that cathodic protection will be installed from end to end as required by state and federal regulations. Cathodic protection puts a weak electrical current onto the pipeline to inhibit corrosion from occurring. Cathodic protection test stations are installed along the entire route, including the crossings, to ensure it is functioning properly.

PIG (pipeline inspection gauge) traps will also be installed at the beginning and end of every diameter of pipe to run through the pipeline to clean and identify any corrosion by measuring the thickness of the wall.

William Sutherland, the manager of pipeline construction for Williams who oversees large diameter projects and tactical major projects, testified that he has never observed any damage to another company's pipeline on a crossing with which he has been involved. He did not see any characteristics at the proposed crossings that would make construction difficult.

William also explained that each pipeline company has guidelines to follow when crossing their pipelines. ETP requires twenty-four inches between the bottom of their pipeline and the top of the other pipeline for open trench crossings. When there is a conventional, horizontal, or directional drill at the crossing, ETP requires a minimum clearance of thirty-six inches between the pipelines. He also explained that LEG will not be placing anything over ETP pipelines, as it plans to cross under the pipelines.

Tye Ragle, the operations director for Williams in the Haynesville Basin, testified that he is responsible for the safe and reliable operation of the equipment associated with the LEG pipeline system. He explained that all the dehydration of the water vapor will take place upstream before it enters the LEG pipeline. The crossings will be protected by patrolling, pigging, and cathodic protection activities. Tye testified that he would insure that the LEG pipeline would not interfere with the ETP's pipelines.

Melvin Sanders was accepted as an expert in the field of pipeline design, construction, and operation. He testified that the LEG pipeline construction exceeds the industry regulatory requirements and practices three-fold. He also testified that

the LEG pipeline is a high integrity design type system and the operation procedures would meet or exceed industry standards, regulations, and practices.

Melvin saw no reason why there should be any concern by ETP. He testified that he saw an advantage at having a pipeline crossing by another company because there would be double patrolling in the area since each company will be monitoring their own systems.

James Guidry, director of technical operations for the South Division of ETP, expressed concern about cathodic interference with its pipelines, which occurs when the current interferes with the coating on the pipeline pulling it away from the pipeline, allowing for corrosion. He explained that older pipelines have an older coating that tends to come off if disturbed. However, Melvin said it is speculation as to whether there would be cathodic interference at the crossings.

James also expressed concern about general construction should ETP have to go in the area of the crossings and perform maintenance on the pipelines. He was also concerned about the replacement of pipelines should that become necessary. While he stated that construction of the LEG pipeline would put a burden on operations, it would not prevent ETP from operating its pipelines. However, James did not have much knowledge about the particulars of the LEG crossing because he was told not to conduct a technical evaluation since it was going to be litigated.

Carl Tims, operations manager with ETP, testified that the burden for possible replacement of pipelines increases with more pipelines. He noted that a third company in addition to LEAP and LEG wants to also cross ETP pipelines in that area. He explained that all of the congestion of the pipelines creates a burden on operations and maintenance. He did agree ETP will still be able to access its pipelines and maintain them when the LEG pipeline is installed, however. Carl was

16

not aware of an instance where the maintenance and operation of pipelines was adversely affected by a crossing. He was also not aware of any plan to replace or remove pipelines on any of the tracts.

Steven Futch, vice president of Interstate Engineering for ETP, who is also responsible for project execution as it relates to pipelines, stated that the more pipelines there are, the more problems there are. He explained that the crossing will have a cumulative and substantial effect for ETP.

Frank Antoine, an expert in the field of operation and maintenance of interstate, intrastate, and gathering pipelines, testified that pipeline crossings increase burdens on operation and management of pipeline assets in the ground. He explained that even if the crossing pipeline is in a different right-of-way, it would impact the amount of dollars that will be spent to maintain the pipelines. He stated that the LEG pipeline will be regulated for safety by the Pipeline and Hazardous Material Safety Administration, or PHMSA, and will have no issue complying with those regulations. Antoine also noted that Williams will take care of its pipelines and control corrosion.

Mark Vedral, the senior director of land and right-of-way at ETP, testified he received an email from Wendy Whitfil-Embry, land manager with Williams, about forty-two crossings for the LEG project in Louisiana. Mark did not feel the two weeks requested for consent was sufficient time to evaluate the situation. He testified that his concern was what land rights Williams had before ETP granted them a no objection letter and encroachment agreement. Mark stated his job did not entail anything to do with a technical evaluation or the pipeline crossing or what operational risks might be involved. His concern was the land rights. However,

17

James Guidry testified that Mark told him not to conduct technical evaluations of these crossings because the issue was going to litigation.

We find that the owner of a predial servitude of a right of use does not have to consent when the landowner grants another right of use on the same property and the agreements between the parties do not prevent it, provided the new use does not infringe upon the existing servitude. Based on the evidence and testimony in this case, the trial judge was correct in his finding that the crossing of ETP pipelines by LEG would have no adverse effect on the ETP pipelines.

## UNCONSTITUTIONAL TAKING

ETP also argues that the judgment of the trial court condones an unconstitutional taking of its property without compensation. ETP claims that if LEG wants to cross third-party pipelines without first obtaining the required consent, then it should follow the law on expropriation by establishing public purpose and necessity before a judicial authority as required to expropriate the property rights owned by ETP. ETP argues that a servitude is property that cannot be interfered with without compensation.

In support of its position, ETP cites La.Const. art. I, § 4(B)(4) which provides: "Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question."

The use and extent of a predial servitude is regulated by the title by which it is created. La.Civ.Code art. 697. When the title provides the exact dimensions of the area affected by the servitude, that description must be given effect and the owner of the servitude may not take over unused areas of the servitude by establishing

18

permanent structures thereon. *Red River v. Noles*, 406 So.2d 294 (La.App. 3 Cir. 1981); *Dupont v. Hebert*, 06-2334 (La.App. 1 Cir. 2/20/08), 984 So.2d 800, *writ denied*, 08-640 (La. 5/9/08), 980 So.2d 695.

We first observe that we have already determined that LEG was not required to get the consent of ETP to cross its pipelines. Additionally, none of the ETP servitudes specify an area for the servitude except to state that it can lay a pipeline and the appurtenances required deep enough so that it does not interfere with farming activities. As the court in *Louisiana Energy Gateway, LLC*, ___ So.3d ___, noted, the servitude does not extend to the center of the earth without specific language stating so. Testimony revealed that LEG's pipelines will cross **under** ETP's pipelines. No language gave ETP a right under its pipelines.

We find no merit in this assignment of error. There was no unconstitutional taking of ETP's property rights.

For the reasons set forth in this opinion, the judgment of the trial court is affirmed. All costs of these proceedings are assessed to Trunkline Gas Company LLC, Energy Transfer Crude Oil Company, LLC, and DAPL-ETCO Operations Management, LLC.

**AFFIRMED.**